UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SAMUEL L. SMITHERS,

        Petitioner,

v.                        Case No.8:09-cv-2200-T-17EAJ

DEATH PENALTY PETITION

SECRETARY, DEPT. OF CORRECTIONS,

        Respondent.

_____

## O R D E R

This cause is before the Court on Samuel L. Smithers' timely-filed 28 U.S.C. § 2254 petition for writ of habeas corpus. Smithers, a Florida prisoner sentenced to death, challenges his convictions and sentences entered by the Circuit Court for the Thirteenth Judicial Circuit, Hillsborough County, Florida.  A review of the record demonstrates that, for the reasons below, the petition must be **denied**.

FACTUAL BACKGROUND

In its opinion affirming Smithers' convictions and death sentences, the Florida Supreme Court set forth the salient facts as follows:

> [I]n 1995, Sam Smithers agreed to mow the grass at a vacant Plant City house owned by Marion Whitehurst. Whitehurst and Smithers attended the same church. Whitehurst was attempting to sell the house and therefore needed the landscape to be maintained by Smithers. There are three ponds surrounding the house and the twenty-seven acre property is enclosed by a fence with a gate at the front. Whitehurst gave Smithers a key to the gate but not the house.

In 1996, Smithers and Whitehurst renewed their agreement. Smithers mowed the lawn the week of May 20 and Whitehurst paid Smithers on May 26. At approximately 7 p.m. on May 28, Whitehurst decided to stop by the property. The gate was locked when she arrived, but after opening the gate and driving to the house, Whitehurst found Smithers' truck parked just outside the carport. Smithers was sitting in the carport cleaning an axe. Smithers told Whitehurst that he had returned to the property to cut down some tree limbs. During the conversation, Whitehurst noticed a pool of blood in the carport. Smithers told her that someone must have come by and killed a small animal. He assured her that he would clean up the mess.

Although Whitehurst left the house, she was bothered by the pool of blood, and therefore she contacted the Sheriff's Department. Later that night, Deputy Skolnik met Whitehurst at the property. The pool of blood had been cleaned up, but the deputy noticed what appeared to be drag marks in the grass leading towards one of the ponds. The deputy followed the drag marks down to the pond and discovered a dead female body floating in the water. The woman was later identified as Cristy Cowan. A dive team subsequently discovered a second dead female body in another part of the pond. She was later identified as Denise Roach.

A search of the Whitehurst house revealed a condom wrapper in one of the bedrooms and a semen stain on the carpet. Test results established that Cowan could not have contributed to this stain, but Roach and Smithers could not be excluded. A fingerprint taken from the kitchen was identified as having been made by Smithers. Roach's DNA was consistent with a blood stain found in the carport. Shoe prints by the pond matched the shoes found in Smithers' home. Also, Smithers and Cowan were seen on a convenience store videotape about an hour before Whitehurst arrived at the property on May 26. The videotape depicted Smithers and Cowan entering and leaving the store together.

On the night of May 26, two detectives went to Smithers' home and Smithers agreed to accompany them to the Sheriff"s Office for an interview. Smithers requested that his wife join them. Smithers was questioned for almost three hours. Detective Flair read Smithers his *Miranda* rights and Smithers waived his rights. At the end of the interview, Smithers agreed to return the next morning and take a polygraph test.

Upon returning the following morning, Smithers was given a written version of his *Miranda* rights. Smithers signed a waiver of rights form and proceeded to take the polygraph test. Afterwards, Detective Metzgar explained to Smithers that the polygraph test indicated that he was not telling the truth

and Smithers responded by making some incriminating statements. Metzgar called Detectives Flair and Blake into the room and Flair and Blake continued the interview. Smithers again insisted that his wife be present during the interview. Smithers subsequently admitted that he killed Cristy Cowan and Denise Roach.

Smithers told the detectives the following version of events regarding the Cowan murder. Smithers was coming home from work when he spotted a car on the side of the road. He stopped to assist the driver (Cowan) and drove her to a convenience store. Once back in his truck, Cowan demanded money and threatened to accuse him of rape if he did not give her money. Smithers drove Cowan to the Whitehurst property. Smithers gave Cowan all the money that he had but she still was not satisfied and she threw a drink at him. In response, he picked up an axe and struck Cowan in the head. She fell down unconscious and he dragged her to the pond. He returned to the carport to rinse off the axe when Whitehurst arrived. During the time that Whitehurst was there, he could hear Cowan making noises from the pond (Whitehurst testified that she never heard any sounds). When Whitehurst left, he went back to the pond and hit Cowan in the head "to shut her up." He also threw some tree limbs at her.

Later in the interview, Smithers explained to the detectives his involvement with the Roach murder. On May 7, Smithers was at the Whitehurst property mowing the lawn when Roach approached him. Roach told him that she had permission to be on the property. When Smithers returned to the Whitehurst property on May 13, Roach was still there. Smithers asked her to leave and she refused. Roach then hit Smithers on the arm and Smithers punched Roach in the face. Smithers said that Roach picked up a planter in the carport and threw it at Smithers' truck, causing a dent. Smithers shoved Roach against the wall, causing a piece of wood to fall down from a shelf and hit her on the head. Roach fell to the ground unconscious. Smithers left the property, but he returned the next day and dragged her body to the pond. He cleaned up the blood with mop and a bucket of water.

At the conclusion of the interview, Smithers was arrested and subsequently charged with two counts of murder. Prior to trial, the trial court denied Smithers' motion to sever the two charges and Smithers' motion to suppress his confession.

At trial, the medical examiner testified that at the time Cowan's body was discovered, she had not been dead for more than a couple of hours. There was a foam cone around her mouth which suggested that she might have drowned. Cowan had an injury to her eye, a laceration under her lip, a

- 3 -

blunt impact injury to her jaw, a chop wound on the top of her head which penetrated her brain, and a chop wound behind her ear. She also had injuries consistent with manual strangulation. The medical examiner stated that death was caused by strangulation combined with the chop wounds.

Regarding Roach, the medical examiner testified that the body had been in the pond seven to ten days and was therefore very decomposed. There were two slits in Roach's clothing which were caused by a sharp instrument. Her face and skull were fractured. There were also sixteen puncture wounds to her skull, several of which penetrated the skull. Finally, she had injuries consistent with manual strangulation (the hyoid bone was fractured). The medical examiner stated that death was caused by the combined effects of strangulation, stab wounds, and blunt impact to the head.

The State presented the testimony of several witnesses who stated that both Cowan and Roach were prostitutes and worked in the same location (the Luxury Motel area). Prostitute Bonnie Kruse testified that she had previously "dated" Smithers at the Luxury Motel. Smithers offered Kruse extra money to go with him to Seffner, but she refused. Another prostitute testified that on the day Cowan disappeared, she gave her a condom. This condom was similar to the condom wrapper found inside the Whitehurst property.

Smithers testified during the guilt phase. His story at trial was different from the story he initially told the detectives. Smithers said that he lied to the detectives because he was scared that his family would be harmed if he told the truth. Smithers told the jury that the incident actually began months earlier when he was a deacon at his church. A girl named Mimi was on probation and was fulfilling her community service requirement at the church. Smithers was Mimi's supervisor. Mimi, however, could not complete her hours and she therefore offered to have sex with Smithers if he would alter her records. He agreed. Weeks later, Smithers was approached by a man who was aware that Smithers was a caretaker at the Whitehurst property. Smithers did not know the man nor his name (hereinafter Mr. X). Mr. X asked Smithers if he could use the property for a drug transaction. Mr. X had a picture of Smithers and Mimi. Mr. X said he would go public with the picture if Smithers did not cooperate. Smithers agreed to let Mr. X use the property. On two separate occasions, Mr. X contacted Smithers and asked Smithers to meet him at the property to unlock the gate. Several people were present during the first visit to the property, including Denise Roach. Roach got into an argument with Mr. X and Mr. X hit Roach in the head with a hatchet. Smithers claimed that he just stood and watched. Mr. X then approached Smithers and hit him with a tire tool. He ordered Smithers to drag Roach's body to the pond. Mr. X told Smithers that he would kill his family if he did not keep quiet. A week and a half later, Mr. X

again asked Smithers to meet him at the Whitehurst property. This time Cristy Cowan was present. Several people went inside the house to conduct business. Afterwards, Mr. X ordered Smithers to go inside the house and clean up. When Smithers returned outside, Cowan's dead body was lying in the carport. Mr. X and his cohorts left and Smithers dragged the body to the pond and returned to clean up the carport. It was at this time that Mrs. Whitehurst arrived at the property.

At the close of all the evidence, the jury convicted Smithers of two counts of first-degree murder. During the penalty phase, the State presented Smithers' time card on the day of the Cowan murder, which showed that he left work at 5:23 p.m. The convenience store videotape from that same day indicated that Smithers and Cowan were present at 6:19 p.m. Detective Iverson testified that he was assigned to drive the distance from Smithers' place of work to the Whitehurst property, stopping in between at the place where Cowan was picked up (the Luxury Motel) and at the convenience store where Smithers and Cowan were seen on videotape. Detective Iverson left Smithers' place of work at 5:25 p.m. He arrived at the convenience store at 6:10 p.m. and arrived at the Whitehurst property at 6:17 p.m.

The defense presented the testimony of Smithers' two brothers, his former wife, his son, a local school principal, and a deputy from the detention facility where Smithers was housed during the trial. Smithers' brothers explained that Smithers was physically abused growing up. Smithers' mother would often hit her boys with a belt to "beat the devil out of them." Other witnesses explained that Smithers was a wonderful husband and father and that he never lost his temper with anyone. The deputy testified that Smithers was a model inmate. The defense also presented the testimony of three mental health experts. Apparently when Smithers was an infant, he fell out of his crib and landed on his head. When Smithers was twenty-seven, he was hit in the head with the butt of a shotgun during a robbery at a gas station where he worked. Dr. Wood testified that a PET scan of Smithers' head was abnormal and was consistent with brain damage due to head trauma. Dr. Berland testified that Smithers has a chronic mental illness and was suffering from extreme mental or emotional disturbance at the time of the murders. Dr. Berland also said that Smithers had a substantial impairment in his ability to conform his conduct to the requirements of the law. Dr. Maher testified that Smithers was suffering from extreme mental or emotional disturbance at the time of the murders, that Smithers had a substantial impairment in his ability to conform his conduct to the requirements of the law, and that Smithers had a decreased ability to appreciate the criminality of his conduct.

In rebuttal, the State presented three mental health experts. Dr. Ikeman testified that the PET scan photographs were insufficient to diagnose whether Smithers' brain was functioning properly. Dr. Taylor stated that although Smithers had head injuries, the injuries did not cause brain damage. Dr. Taylor also testified that Smithers is not psychotic. Dr. Stein agreed that Smithers does not have a psychiatric disorder.

The jury ultimately recommended death sentences by a vote of twelve to zero. At the *Spencer* hearing, John Cowan (Cristy Cowan's father) asked the trial court to impose a life sentence. Smithers' former wife made a similar request.

*Smithers v. State*, 826 So. 2d 916, 918-922 (Fla. 2002) (Ex. A33) (footnotes omitted).

## Trial Court Proceedings

Smithers was convicted and sentenced to death on June 25, 1999, for the first degree murders of Cristy Cowan and Denise Roach. (Ex. A2/45-61, 164-5; A19/2362-82). In the sentencing order, the trial court found the following three aggravators for the Cowan murder: (1) previous violent felony (contemporaneous murder), (2) the murder was especially heinous, atrocious, or cruel (HAC), and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and two aggravators for the Roach murder: (1) previous violent felony (contemporaneous murder) and (2) HAC. (Ex. A2/246-53; A19/2366-73). The trial court found the following two statutory mitigators: (1) the murder was committed while Smithers was under the influence of extreme mental or emotional disturbance (moderate weight) and (2) Smithers' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (moderate weight). The trial court also found the following nonstatutory mitigators: (1) Smithers was a good husband and father, (2) Smithers enjoyed a close relationship with his siblings, (3) Smithers was

- 6 -

physically and emotionally abused by his mother as a child, (4) Smithers regularly attended church and was devoted religiously, (5) since being arrested, Smithers has been a model inmate and he would conduct himself appropriately in a prison setting, (6) Smithers has made several contributions to the community, and (7) Smithers confessed to the crimes, but his trial testimony was in conflict with his statements to the detectives. All of the nonstatutory mitigators were given moderate weight. Finally, the court gave great weight to John Cowan"s request that Smithers be given a life sentence. The trial court concluded that the aggravators outweighed the mitigators and therefore sentenced Smithers to death for both murders. (Ex. A2/254-60; A19/2375-82)

## Appellate Proceedings

On appeal to the Florida Supreme Court, Smithers presented the following issues: (1) the trial court erred by denying Smithers' motion to sever the two offenses; (2) the trial court erred by denying Smithers' motion to  suppress his confession; (3) fundamental error occurred when defense counsel waived Smithers' presence for the pretrial motion in limine hearing; (4) the trial court erred in finding HAC for the Roach murder; (5) the trial court erred in finding CCP for the Cowan murder; and (6) the trial court erred by failing to declare a mistrial during the penalty phase when one of the State's witnesses introduced lack of remorse as a consideration. The court denied relief and affirmed the judgments and death sentences imposed. *Smithers*, 826 So. 2d at 931. (Ex. A33) A petition for writ of certiorari was then taken to the United States Supreme Court and denied on February 24, 2003. *Smithers v. Florida*, 537 U.S. 1203 (2003). (Ex. B1; B3)

**Postconviction Proceedings**

Smithers initial 3.851 motion was filed on December 29, 2003. (Ex. C1/69-136) An amended motion was filed on April 07, 2006, which alleged the following seven claims: 1) ineffective assistance of guilt phase counsel; 2) ineffective assistance of penalty phase counsel; 3) [no claim is enumerated as (3)]; 4) prohibition against juror interviews; 5) ineffective assistance for failing to litigate the following claims: a) jury was unconstitutionally relieved of its responsibility to determine the appropriateness of Smithers' death sentence; b) jury instructions unconstitutionally relieved the state of its burden to prove an element of the death penalty eligible offense; c) heinous, atrocious or cruel jury instruction was unconstitutionally vague and broad; d) cold, calculated and premeditated jury instruction was unconstitutionally vague and broad; 6) Florida's capital sentencing scheme was unconstitutional and counsel was ineffective for failing to litigate the issue; 7) Smithers may be incompetent for execution; and 8) [enumerated as (6) in motion], cumulative error. (Ex. C1/137-C2/277)

The court subsequently ordered an evidentiary hearing on Claims I and II, which was held on August 16 and 17, 2007. (Ex. C2/278-79; C7/830-932; C8/933-1063) At the evidentiary hearing, Smithers presented six witnesses. First, Dr. Ronald Keith Wright, a forensic pathologist, testified that he was retained to render an opinion as to Christy Cowan's cause of death. (Ex. C7/1013-16) He testified that it was his opinion that Ms. Cowan died of asphyxiation as a result of manual strangulation, but conceded that it was possible that she died of drowning. (Ex. C7/1018) He opined that the blunt force injuries to her body were inflicted postmortem or perimortem, but probably perimortem. (Ex. C7/1020-

21) He noted that in the medical examiner, Dr. Laura Hair's report, she originally found that the cause of death was chop wounds to the head and manual strangulation. (Ex. C7/1023) At trial, however, she opined that Cowan had died from drowning. (Ex. C7/1024) On cross-examination, Dr. Wright stated the basis for his opinion that the head injuries were inflicted postmortem or perimortem was based on the lack of bleeding. (Ex. C7/1026) He was not sure if he knew that a large pool of blood was found on the floor of the garage, but opined that it would be consistent with the injuries to her mouth and head. He also conceded that the foaming in Cowan's mouth would be consistent with Ms. Cowan being dragged to the lake and then kept underwater for a short period of time. (Ex. C7/1027-28)

Next, the defense called Caresa Snyder who testified that she had been a neighbor of Smithers for ten years prior to his arrest. (Ex. C7/1033) She described the defendant as friendly, sweet, and good to her boys. She felt like Smithers was a little slow or just had a lower IQ. At one point, in May of 1996, while she was on vacation, she received a call from her mother that Smithers had brought the Snyder children homemade ice cream and while he was there he was ranting and raving, looked wild-eyed and made statements about "killing some niggers in Tennessee." (Ex. C7/1035) In 1995 they had given Smithers a key while they were out of town. They returned home early to discover the house in disarray and the small appliances stacked on the kitchen table. A Black and Decker screwdriver, like the one that was missing from her house, was later found at Smithers' home. (Ex. C7/1036-37)

Gerald Dean Snyder then testified that he did not enjoy socializing with Smithers because the dialogue was somewhat difficult for Smithers as he was somewhat slow. (Ex.

C7/1048) He believed Smithers was very close to his father-in-law, Mr. Powell, who later became ill and was put in a nursing home. (Ex. C7/104) Mr. Powell was a stabilizing influence on Smithers and provided financial support. (Ex. C7/1053) Although Smithers worked at Borrell Electric for several months, he believed Smithers lost a few jobs and the stress level became increasingly larger. He disputed Smithers' testimony that while they were talking one day a Bentley rolled up in front of Smithers' house. (Ex. C7/1050, 1054) The only stress-related changes he could identify were that Smithers had "glassy eyes, became standoffish and was not as close to their children as he had been." (Ex. C7/1055)

The defense next presented Dr. Michael Scott Maher, M.D. who was accepted as a medical doctor and an expert in the field of forensic psychiatry. (Ex. C7/1058) He testified that he was retained by trial counsel in 1997 to do a mental status examination on Smithers. (Ex. C7/1059-60) Toward that end, he did testing, he reviewed school records, he interviewed family members and he consulted with Drs. Wood and Berland. He recommended and Judge Fuente granted the motion to obtain one. (Ex. C7/1060-62) Both he and Dr. Berland gave Smithers an MMPI2 on which Smithers scored high on the psychosis scale. He defined psychosis as a break with reality. (Ex. C7/1067) At the time, he did not diagnose Smithers as psychotic although Dr. Berland did. He also explained that he found no direct indications of hallucinations or delusions but there was a possibility that Smithers may have suffered with hallucinations or delusions. (Ex. C7/1069) Now, however, he believed that Smithers' claim that he was talking to Snyder when a Bentley rolled up was significant. (Ex. C7/1072) Because Snyder denied it happened, it was a strong suggestion of psychosis or a drug-induced delirium or some other very substantial disturbance of

perception and reality. (Ex. C7/1074) Including Snyder in the story either showed 1) intellectual impairment, which is not present in this case, to think that no one would contact Snyder, or 2) that he was out of touch with reality and believed what he was saying was true. (Ex. C7/1074) This action coupled with his prior information now led him to concur with Dr. Berland. (Ex. C7/1075) Dr. Maher also opined that Christy Cowan died as a result of blows to the head and strangulation. (Ex. C7/1079) He also found that Smithers hearing things no one else reported hearing was evidence of psychosis. (Ex. C7/1081) He was unaware previously that Whitehurst denied hearing any noise from the pond. (Ex. C7/1083)

On cross-examination Dr. Maher testified that his diagnosis at the time of trial was dissociative disorder. (Ex. C7/1084) The basis of his change in diagnosis to psychotic episode recurrent was the Snyder and Whitehurst statements with possible presence of auditory hallucinations. (Ex. C7/1085-86) He agreed that the burglary of the Snyder house was an antisocial act and consistent with a diagnosis of antisocial personality disorder. (Ex. C7/1087) Dr. Maher agreed that during his original five interviews with the defendant, Smithers admitted killing Ms. Cowan and Ms. Roach; taking both to the property to have sex with them; dragging Ms. Roach's body to the pond to hide the body; that they had a conflict over money; he took an axe to her and killed her in the garage and then was in the process of cleaning the axe when Mrs. Whitehurst arrived. (Ex. C7/1091-94) During the five separate times he saw Smithers, the defendant never told him about the "mystery man." Prior to the penalty phase he was given Smithers' trial testimony where he testified about the mystery man at the Whitehurst estate. (Ex. C7/1094) Even though this story of the mystery man was totally contrary to what the defendant told Dr. Maher, Dr. Berland and law

enforcement, his conclusion at the penalty phase was that Smithers was dissociative. (Ex. C7/1095) Now with the Snyder statement, he changed it to psychosis. (Ex. C7/1097) He did not recall if he knew at the time of trial that Whitehurst said she heard nothing. (Ex. C7/1098) The state then introduced his testimony at the penalty phase where he acknowledged knowing that the defendant heard voices that Ms. Whitehurst did not hear and finding that it was evidence of auditory hallucination. (Ex. C7/1100)

Daniel Mario Hernandez testified that he represented Smithers at the guilt phase of his trial. He testified that he had been practicing law for thirty years and that during his thirty years a majority of his practice was in criminal law. He is on the limited list of approved attorneys to handle first degree murder cases and death cases in Hillsborough County. (Ex. C8/1134) Hernandez testified that he had probably handled 25 to 30 murder cases. (Ex. C8/1135) He filed a motion to suppress Smithers' statements which was denied. (Ex. C8/1116) He had not seen his file in years nor had he read a trial transcript. (Ex. C8/1117) Hernandez identified motions in limine he filed to exclude testimony that the defendant was "hanging out" with prostitutes and to exclude crime scene video. (Ex. C8/1118-21) Hernandez did not recall that he did not file a motion to exclude Detective Flair's testimony that Smithers told him that Ms. Roach was a black girl and he guessed some prejudice set in so he hit her again. (Ex. C8/1124) He opined that the problem with filing such a motion was that the fact that she was black and that the defendant may have had some prejudice towards a black victim was inextricably intertwined. (Ex. C8/1125) Moreover, the statement diminished the premeditation aspect to reduce it to second degree murder. (Ex. C8/1140) He also noted that he requested an instruction on accessory after the fact and that it was

later denied by Judge Fuente. (Ex. C8/1128) He also filed all of the motions that he felt were necessary to protect his client's rights. (Ex. C8/1135) He testified that he does not file motions that he thinks are absolutely frivolous. (Ex. C8/1136) No burglary instruction was given and the state's theory was that since there was no legitimate explanation for his fingerprint being in the house, it was evidence of his guilt for the instant crime. (Ex. C8/1141) Counsel did not think that the evidence that Smithers may have entered the Whitehurst residence without permission had anything to do with the finding of guilt. (Ex. C8/1143) In his opinion, evidence of a burglary and/or racial bias were inconsequential considering the overwhelming evidence against Smithers and he would have been convicted without either. (Ex. C8/1149)

The defense next presented trial counsel Scott Lyon Robbins. (Ex. C8/1152) He was in charge of the penalty phase and he death-qualified the Smithers' jury. (Ex. C8/1155) In response to questioning about the colloquy with respective juror Collins at volume 4, page 232-33, Robbins had no memory of the juror. (Ex. C8/1155-57) He later testified, however, that after reviewing the colloquy he thought the juror's responses reflected an ability to consider mitigating factors and he did not think there would have been a for-cause objection. (Ex. C8/1174-75) With regard to Mr. Snyder, he recollected that his investigator, Diane Fernandez, contacted Mr. Snyder by phone, but that he personally had not spoken to him. (Ex. C8/1160) In response to questioning regarding why they did not obtain an independent medical examiner, he noted that they were able to make the same argument based on the M.E.'s report. (Ex. C8/1168)

On cross-examination, counsel testified that he had been a criminal defense attorney since 1982. (Ex. C8/1170) He worked for the Public Defender for eleven years before going into private practice and had handled approximately ten first degree murder cases. (Ex. C8/1171-72) He also noted that although Dr. Maher diagnosed Smithers as having dissociative disorder, he did recognize that his description of hearing voices was a hallucination. (Ex. C8/1182) Although they had initially prepared for trial based on Smithers' description of the events as given to the police, Smithers later gave them a completely different version which was memorialized by Diane Fernandez in a memo. (Ex. C8/1183) He noted that Diane Fernandez was an experienced investigator and was particularly good in capital cases collecting mitigation evidence. (Ex. C8/1184) Ms. Fernandez worked closely with Mrs. Smithers who was very useful in providing introductions so that Ms. Fernandez could get closer to some of the witnesses. (Ex. C8/1185) Ms. Fernandez checked with Snyder and learned he could not corroborate Smithers' story. (Ex. C8/1186) Further, at trial Smithers did not mention that Snyder was present for the meeting. Additionally, he provided copies of Smithers' testimony to his experts, as well as information he received prior to trial. (Ex. C8/1189) Dr. Maher testified about Smithers' testimony about Mr. X; he believed Smithers was lying. (Ex. C8/1190; A15/2015) He did not have information that Smithers had allegedly committed a prior burglary on the Snyder's home. (Ex. C8/1191-92) With regard to Dr. Hair, he received her report where she found that the cause of death was blunt head trauma and strangulation, that the foam cone could be indicative of drowning or other things. (Ex. C8/1195) After hearing her testimony he still did not think he needed another expert because Dr. Hair's opinion was still that cause of

- 14 -

death was strangulation and blunt head trauma with a possibility the foam cone was from drowning. (Ex. C8/1196) They tried to refute evidence of strangulation with the argument that injury to the throat area was caused by a blow to show that death occurred quickly because a slow strangulation was bad for his client. Dr. Hair conceded that was possible and that the cone could be from a drug overdose or heart attack. (Ex. C8/1198-1200) He also got her to concede that she could have been unconscious which was helpful as to the heinous, atrocious or cruel aggravator. (Ex. C8/1201) Dr. Hair's finding that the cause of death was by blunt instrument was helpful in arguing to jury that the victim did not die of strangulation. (Ex. C8/1202) Hiring an expert who opined that strangulation was definitely the cause of death would have undermined the blunt trauma argument but would have helped with the drowning argument. (Ex. C8/1203)

He testified that when he "came onboard" Drs. Maher and Berland had already been brought into the case. He was aware that Smithers confessed to both doctors. He was surprised when Smithers changed his story to say that Mr. X committed the crime. (Ex. C8/1210) He then investigated the story. (Ex. C8/1211) He had serious concerns that after having made so many statements essentially confessing to these aspects of the crime, the jury would have problems finding him credible. (Ex. C8/1212) Additionally, his recollection is different from the memorandum; he did not recall him saying that Dean Snyder had actually interacted with Mr. X, only that he was outside and Smithers had been talking to him. (Ex. C8/1213) He did not perceive Smithers' statement to be evidence of a hallucination. (Ex. C8/1217) With regard to Dr. Maher, counsel testified that he believed Dr. Maher was aware of Diane Fernandez's report that Smithers said Dean Snyder was there

when Mr. X drove up and he thought it was factored into Dr. Maher's diagnosis. (Ex. C8/1217) He thought it could be just a bad detail or a bad lie on Smithers' part; he did not think it evidence of psychosis. (Ex. C8/1218) He also recalled that they disputed the state's argument that Cristy Cowan was gasping for breath. (Ex. C8/1225) On recross he confirmed that in the sentencing order, the trial court did not mention drowning. (Ex. C8/1227-28)

On October 26, 2007, the state trial court filed a written order denying the Rule 3.851 motion to vacate. (Ex. C2/310-402, 3/403-603, 4/604-804) Smithers appealed to the Florida Supreme Court, raising two issues: (I) ineffective assistance of counsel in guilt phase, and (II) ineffective assistance of counsel in penalty phase. (Initial Brief of Appellant, Ex. C11) Smithers filed a petition for writ of habeas corpus simultaneously with the initial brief in the appeal of the denial of his motion to vacate and raised the following issues: (A) Florida's rules regulating post-trial juror interviews are unconstitutional; (B) the penalty phase jury instructions were constitutionally inadequate; (C) Florida's capital sentencing scheme is unconstitutional; (D) cumulative error deprived Smithers of a fair trial; and (E) Smithers may be incompetent to be executed. (Petition for Writ of Habeas Corpus, Ex. C13)

The Florida Supreme Court affirmed on appeal and denied Smithers' habeas petition. *Smithers v. State*, 18 So. 3d 460 (Fla. 2009). (Ex. C15) Smithers' motion for rehearing was denied September 24, 2009, and the mandate issued October 12, 2009. (Ex. C16; C17; C18)

Smithers' counsel filed a Petition for Writ of Habeas Corpus (Doc. 1) in this Court on October 28, 2009 and a memorandum in support of the petition (Doc. 12) on December 9, 2009.

## STANDARDS OF REVIEW

This petition, initially filed in 2009, is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Woodford v. Garceau*, 538 U.S. 202 (2003); *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). AEDPA affects this Court's review of both factual findings and legal rulings entered by the state courts in the rejection of Smithers' federal claims. Pursuant to 28 U.S.C. §2254(e)(1), this Court's review of state court factual findings must be highly deferential; such findings are presumed correct, unless rebutted by a petitioner with clear and convincing evidence. *Wood v. Allen*, 542 F.3d 1281, 1285 (11th Cir. 2008), *affirmed*, ___ U.S. ___, 2010 WL 173369 (Jan. 20, 2010); *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002); *Robinson v. Moore*, 300 F.3d 1320, 1342 (11th Cir. 2002). Moreover, relief which was denied in state court due to asserted factual error can only be granted on habeas where the state court resolution turned on a determination of facts which was not just incorrect but unreasonable. *Wood*, 542 F.3d at 1285; 28 U.S.C. §2254(d)(2).

Similarly, the legal rulings of claims adjudicated in state courts only provide a basis for federal relief where the state court adjudication was either "contrary to" clearly established federal law as determined by the United States Supreme Court, or involved an "unreasonable application" of such law. *See* 28 U.S.C. §2254(d)(1); *Haliburton v. Secretary, Dept. of Corrections*, 342 F.3d 1233, 1238 (11th Cir. 2003). In *[Terry] Williams*

- 17 -

*v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed these standards at length. The Court explained that a state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. The question is whether the state court correctly *identified* the proper rule of law to be applied. *Robinson*, 300 F.3d at 1344-45; *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). A state court decision is not "contrary to" established federal law even if a federal court might have reached a different result relying on the same law. *Williams*, 529 U.S. at 405-06; *Robinson*, 300 F.3d at 1344-45.

A state court ruling is an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law, but unreasonably *applies* that rule to the facts of the petitioner's case. An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. A federal court does not independently review the correctness of the state court adjudication; the "unreasonable application" analysis requires a showing that the state court ruling is not simply incorrect or erroneous, but *objectively unreasonable. Williams*, 529 U.S. at 409-410; *Robinson*, 300 F.3d at 1345; *Putman*, 268 F.3d at 1241. The measuring stick for both the "contrary to" and "unreasonable application" assessments of the state court merits adjudication is "clearly established federal law," which refers only to the holdings, and not dicta, of the United

States Supreme Court at the time of the relevant state law decisions. *Williams*, 529 U.S. at 412; *Putman*, 268 F.3d at 1241.

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court set forth the standard for relief where constitutional error is determined to exist on habeas review. This test is "less onerous" then the harmless error standard enunciated in *Chapman v. California*, 386 U.S. 18 (1967). "The test is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht*, 507 U.S. at 637. Although no constitutional error has occurred in this case, any possible error would clearly be harmless beyond any reasonable doubt based on the facts and the record herein.

AEDPA requires greater deference to state court decisions than the traditional *de novo* standard of review; Smithers has the burden to overcome the presumption of correctness attached to state court factual findings or to establish that the state court legal rulings were contrary to, or unreasonable applications of, established federal law. *Crawford*, 311 F.3d at 1295.

## DISCUSSION

### GROUND ONE: Denial of Motion To Sever

Smithers disputes the trial court ruling to deny his request for separate trials for the two homicides he was charged with committing on Denise Roach and Cristy Cowan. (Petition, pp. 4-5; Memorandum, pp. 5-7)

Smithers has failed to establish any basis for habeas relief, as the state court resolution of this issue was not contrary to, or an unreasonable application of, established federal law. Smithers cites *Cross v. United States*, 335 F.2d 987 (D.C. Cir. 1964), but that case cannot provide any established federal law under AEDPA because it is not a decision from the United States Supreme Court; "clearly established federal law," refers only to the holdings of the United States Supreme Court at the time the state court considered the claim. *Williams*, 529 U.S. at 412; *Putman*, 268 F.3d at 1241. Smithers has not cited any established federal law from the United States Supreme Court recognizing a constitutional right to be tried separately for separate offenses. Smithers' petition does not raise a facially sufficient claim. *Washington v. Crosby*, 324 F.3d 1263, 1265-66 (11th Cir. 2003) (concluding state court decision could not be contrary to established federal law where defendant did not cite any United States Supreme Court precedent to support his constitutional claim).

Moreover, the state court rejection of this issue is fully consistent with *Cross*. In denying this claim on direct appeal, the Florida Supreme Court held:

> In his first claim, Smithers contends that the trial court erred by denying his motion to sever the two offenses. We disagree. The decision to grant or deny a motion for severance rests within the sound discretion of the trial court. *See Fotopoulos v. State*, 608 So.2d 784 (Fla. 1992). Denial of a motion for severance is reviewed for abuse of discretion. *See Crossley v. State*, 596 So.2d 447 (Fla. 1992). Florida Rule of Criminal Procedure 3.150 states in pertinent part:
>
> > (a) Joinder of Offenses. Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses ... are based on the same act or transaction or on 2 or more connected acts or transactions.

- 20 -

In *Wright v. State*, 586 So.2d 1024, 1029-30 (Fla. 1991) (quoting *Garcia v. State*, 568 So.2d 896, 899 (Fla. 1990)) (citations omitted), this Court stated the following:

"[T]he rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are connected only by similar circumstances and the accused's alleged guilt in both or all instances." Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence.

In *Garcia v. State*, 568 So.2d 896, 899 (Fla. 1990), this Court explained that "the connected acts or transactions requirement of rule 3.150 means that the acts joined for trial must be considered in an episodic sense." Joinder is not warranted where the offenses are unrelated in terms of time or sequence. *See Paul v. State*, 385 So.2d 1371, 1372 (Fla. 1980). There must be a "meaningful relationship" between the charges before permitting them to be tried together. *See Ellis v. State*, 622 So.2d 991, 999 (Fla. 1993).

Previously, this Court has recognized two general categories of cases where joinder was proper. This Court's opinions in *Bundy v. State*, 455 So.2d 330 (Fla. 1984), and *Fotopoulos* illustrate those two categories. In *Bundy*, the defendant attacked four women, killing two, in a Florida State University sorority house. Roughly an hour later, *Bundy* attacked a fifth woman in an apartment house several blocks away. This Court found that "the criminal acts [were] connected by the close proximity in time and location, by their nature, and by the manner in which they were perpetrated." *Bundy*, 455 So.2d at 345. In *Ellis*, this Court characterized the *Bundy* crimes as "a classic example of an uninterrupted crime spree in which no significant period of respite separated the multiple crimes." 622 So.2d at 999.

In *Fotopoulos*, the defendant induced a woman to murder another man while he videotaped the shooting. He then used the video to blackmail the woman into hiring a hit man to murder his wife a month later. This Court found that since one crime induced the other crime, a sufficient causal link existed to permit joinder. Thus, for joinder to be appropriate the crimes in question must be linked in some significant way. In the past this has meant that the crimes must have occurred during a "spree" interrupted by no significant period of respite (*Bundy*) or the crimes must have been causally related to each other, even though there may have been a significant lapse of time (*Fotopoulos*). But the mere fact of a general temporal and geographic

- 21 -

proximity has not been sufficient in itself to justify joinder except to the extent that it helps prove a proper and significant link between the crimes. *See Ellis*, 622 So.2d at 1000.

In the present case, the trial court stated the following in its order denying Smithers" motion to sever:

[T]he two homicides, while separated in time by as many as 15 days, are connected acts or transactions in an episodic sense.

Additionally, it is likely that even if severed, evidence of one homicide would be relevant and admissible in a separate trial of the other homicide, pursuant to section 90.404(2), Florida Statutes, on the issue(s) of motive, opportunity, intent, preparation, plan, or knowledge.

Judicial economy is of no moment or concern to the Court, given that the State will seek a death penalty upon a conviction of either count.

It would be illogical to present evidence of the finding of Cristy Cowan's recently deceased body separate from evidence of the finding of Denise Roach's decomposed body. Both bodies were found at the same time at the same place.

The statements of the Defendant include first, his admission to killing Cristy Cowan, and later his admission to killing Denise Roach. These admissions are separated by several hours. It would be misleading to a jury to suggest to them, or to allow them to infer, that the Defendant was questioned for several hours before he admitted the homicide of Cristy Cowan, when in fact he initially admitted to the homicide of [Cowan], and then upon further questioning, admitted to the homicide of [Roach].

The two offenses occurred at the same location, within two weeks of each other, and were similar in nature and in the manner in which they were perpetrated. Both offenses involved victims who were prostitutes working in the same area who had sexual relations with the Defendant at the house where each was killed and where the body of each was found. Each was killed in a similar fashion.

(Citations omitted.) The facts of this case do not fit squarely into either the "spree" or "causal link" categories. This Court has allowed joinder when the crimes were separated by as much as three days, *see Rolling v. State*, 695 So.2d 278 (Fla. 1997), but the crimes in the instant case were separated by seven to ten days. Further, although we agree with the State that Smithers' success in carrying out the first murder provided the impetus to repeat the crime, there is not a direct causal link between the two murders, at least not in the manner in which this Court described "causal link" in *Fotopoulos* (i.e., the first offense "induced" the second). Nevertheless, we find that joinder was appropriate in this case based on the unique facts of this record. Both victims were prostitutes, both were taken from the Luxury Motel to the Whitehurst property, both had sex with Smithers inside the house, both were murdered in a similar fashion in the carport with tools apparently located in the carport, and both bodies were dragged into a pond behind the house. Both murders were committed within a ten-day time frame. Finally, both bodies were discovered at the same time and the defendant confessed to both murders in the same interview. There is clearly a "meaningful relationship" between the two crimes and they are without question "linked in some significant way." Under these circumstances, we find that the trial court did not err in denying Smithers" motion to sever.

*Smithers*, 826 So. 2d at 922-24.

The Florida Supreme Court's factual findings are well supported by the record, and Smithers does not allege that the state court resolution of this claim rests on any unreasonable determination of facts. His only argument in support of relief is a citation to *Cross*. In *Cross*, the circuit court held, pursuant to the federal rules of procedure, that two separate robberies which were distinct in "time, place, and evidence" and should have been tried separately where the defendant wanted to testify as to one of the offenses, but not the other one. *Cross* does not help Smithers; in addition to the fact that it is a circuit court case based on federal rules rather than any constitutional principles, it is factually distinguishable. The robberies at issue in *Cross* were months apart, and clearly lacked the geographic, temporal, and evidentiary links that the state courts identified in permitting the

- 23 -

joint trial in this case. In addition, Smithers has never identified any prejudice flowing from the joint trial in this case, given the state courts' finding that the same evidence would be admissible at separate trials, unlike in *Cross* where the defendant's right to testify was unfairly impacted.

Notably, the instant case is not one where constitutional rights were implicated by the joint trial, such as in *Cruz v. New York*, 481 U.S. 186 (1987), where a joint trial among codefendants violated one defendant's right of confrontation when his codefedendant's statements were used at the trial. Smithers has identified only the amorphous "fair trial" he is guaranteed by the Constitution, but has not demonstrated that established federal law precluded his joint trial for both murders or identified any prejudice to support a suggestion that his trial was not fair.

**Smithers did not contradict nor respond to the Respondent's response on the merits of ground one in his reply. He cites no case law except *Cross* in his memorandum in support of the petition.**

On these facts, Smithers has failed to establish that his current custody is a result of any constitutional error in the joining of the Cowan and Roach offenses for trial. Ground one does not warrant habeas corpus relief.

### GROUND TWO: Denial of Motion To Suppress

Smithers challenges the trial court's denial of a motion to suppress incriminating statements Smithers provided to law enforcement. (Petition, pp. 5-7; Memorandum, pp. 7-8)

Smithers has failed to establish any basis for habeas relief, as the state court resolution of this issue was not contrary to, or an unreasonable application of, established federal law. Smithers cites *Miranda v. Arizona,* 384 U.S. 486 (1966), and *Brewer v. Williams*, 430 U.S. 387 (1977), but the state court resolution of this issue was not inconsistent with the established federal law found in those cases.  A review of the record demonstrates that the state court resolution of this case was fully consistent with all applicable federal law.

<u>Smithers' Inquiry About a Lawyer</u>

Smithers contends that "an adequate answer was not given to Petitioner Smithers' inquiry concerning representation by counsel."  Smithers raises this claim in his 28 U.S.C. § 2254 and in his memorandum in support of the petition.

This claim has no merit.  Smithers contends that Detective Flair failed to comply with the dictates of *Almeida v. State*, 737 So. 2d 520 (Fla. 1999), *cert. denied*, 520 U.S. 1118 (2000), regarding the detective's duty to clarify Smithers' constitutional right to counsel. At the suppression hearing, Detective Flair testified as follows:

> Q.  During that interview in the late hours of May 28th, actually early morning hours of May 29th, did Mr. Smithers make any inquiries as to his need for an attorney?
>
> A.  Yes, he did.
>
> Q.  Could you please tell the Court when in the scheme of things did he make inquiry and what inquiry he made?
>
> A.   After talking with him for some time and I -- I started him -- advised him of *Miranda* at which time he asked, "Do I need a lawyer?"  And my response to him was, "Do you think you need a lawyer?"  And he says, "No."  I said, "Do you want an attorney?" "No."  And I said, "Let me do this."  I started over again

with the *Miranda* warnings, read it to him again completely.  And asked if he then would consent to an interview. If he wanted an attorney one could be present, but the answers were yes to the interview.  "No, I don't need an attorney present."  He signed the consent and continued with the interview."

Based upon this testimony, the trial court ruled that Smithers was ". . . properly advised of and understood his constitutional right against self-incrimination and that he knowingly and voluntarily waived those rights."

Nonetheless, Smithers maintains that Detective Flair did not respond appropriately to Smithers' question.  Smithers relies on the *Almeida* decision to craft an argument that the police have a duty beyond that exercised by Detective Flair in situations where a defendant inquires about needing an attorney.  However, *Almeida* does not require any more from Detective Flair than the direct response she provided.

The confession ultimately suppressed in *Almeida* began with the following exchange:

Q. Do you mind if we call you Ozzie during this, or do you prefer your own name.

A. That is okay.

Q. Ozzie's okay.

A. Okay.

Q.  Can you read and write the English language?

A.  Can I read English?

Q.  Can you read and write the English language?

A.  Yes.

Q.  Did you graduate high school?

A.  No, not yet.  I was still finishing.

A.  All right.  Prior to us going on this tape here, I read your *Miranda* rights to you.  That is the form that I have here in front of you, is that correct? Did you understand all of these rights that I read to you?

A.  Yes.

Q.  Do you wish to speak to me now without an attorney present?

A.  Well, what good is an attorney going to do?

Q.   Okay, well you already spoke to me and your want to speak to me again on tape?

Q. (By Detective Allard) We are, we are just going to talk to you as we talked to you before, that is all.

A.  Oh, sure.

Q. (By Detective Mink) Ozzie, this is a statement taken in reference to an incident that occurred at in front of Higgy's on November 15th, 1993, in the morning hours.  Where the night manager by the name of Frank Ingargiola was shot in the parking lot, but directly out in front of Higgy's.  In your own words can you tell me what took place on this night and your involvement in this?

A.  Yes, Me and a couple of friends went to Higgy's after work.

*See Almeida*, 737 So. 2d at 522.  Almeida then confessed to three murders.  *See Id.*

In suppressing Almeida's confession, the court set the guidelines for law enforcement

to follow when faced with a defendant who makes inquiry concerning his rights.

[I]f, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwise -i.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspect-is to actively promote the very coercion that Traylor was intended to dispel. A suspect who has been ignored or overridden concerning a right will be reluctant to exercise that right freely. Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights). Any statement obtained in violation of this proscription violates the

Florida Constitution and cannot be used by the State. *See Traylor*, 596 So.2d at 966.

*Almeida*, 737 So. 2d at 525.

In Smithers' case, in response to Smithers' question concerning his right to counsel, Detective Flair asked him point blank whether he wanted an attorney.  Smithers clearly responded that he did not want an attorney.  Detective Flair then further clarified Smithers' rights by repeating his *Miranda* rights in their entirety.  Smithers then initialed each line of the *Miranda* form, signed his consent and voluntarily continued the interview.  Smithers confirmed that he waived his rights in his testimony at the suppression hearing, adding that he did not feel that he needed an attorney at that point.  Finally Detective Flair clarified on cross-examination that, had Smithers invoked his right to counsel, she would not have continued questioning.

Detective Flair's response met the *Almeida* requirements.  In contrast, the detective questioning Almeida ignored his reference to his right to counsel thereby "steamrolling" Almeida into a confession. *See Almeida* at 515.  No such improper "gamesmanship" occurred in Smithers' case.

To the contrary, Detective Flair directly asked Smithers if he wished to have an attorney, and Smithers declined the offer.  Under those circumstances, Detective Flair was free to resume the interview where Smithers knowingly and voluntarily waived his rights.  Therefore, the trial court properly denied the motion to suppress as it related to Smithers' inquiry concerning his right to counsel.

<u>Remaining Ground Two Claims</u>

In denying relief on the remaining claims, the Florida Supreme Court held:

> In his second claim, Smithers asserts that the trial court erred by denying his motion to suppress his confession. An appellate court should accord a presumption of correctness to a trial court's ruling on a motion to suppress with regard to the trial court"s determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution. See *Connor v. State*, 803 So.2d 598 (Fla. 2001).

> Smithers offers three different grounds for suppressing the confession. We address each of these grounds in turn. First, Smithers argues that a detective used religious coercion to persuade him to confess. Smithers was questioned by law enforcement officials on the night that the bodies were discovered. After this initial interview, Smithers was returned to his home and was asked to come back the next morning to take a polygraph test. At the conclusion of the polygraph test, Detective Metzgar approached Smithers and stated the following:

>> And I knew that if he attended church-of course, I'm a Christian and I explained to him that if he was a Christian-and it was my belief based on the polygraph he wasn't telling the truth about this, that he might want to tell the truth about it, that that is probably the right thing to do.

> Shortly thereafter, Smithers made some incriminating statements to Detective Metzgar (the record is not clear regarding the content of these statements). Smithers claims that Metzgar's statements were coercive because they were a blatant appeal to Smithers' religious beliefs.

> In *Walker v. State*, 707 So.2d 300 (Fla. 1997), this Court considered a defendant's claim that the police used a number of coercive tactics to obtain a confession. This Court described one of the tactics as "knowing that Walker was a deacon in his church, police exploited his religious beliefs when they told him that God would not believe his 'abduction' story." The Court affirmed the trial court"s denial of the motion to suppress, finding that the record supported the trial court's conclusion that the confession was given freely and voluntarily.

- 29 -

In *Hudson v. State*, 538 So.2d 829 (Fla. 1989), this Court considered whether the so-called "Christian burial technique" rendered a confession involuntary:

> At the suppression hearing the sergeant testified as to what he had said to Hudson:
>
>> ... I then appealed to Mr. Hudson's emotions in regard to the fact that I asked him if he had ever been to a funeral. And, obviously, he responded "Yes." I asked him if he had ever been to a funeral without a body. He said he had not.
>>
>> I then conveyed that most of us don't go to funerals without a body. And that for the family to put this situation to rest, due to the fact he had already advised us that he had seen the body, that the young lady was, in fact, dead, I was aware of that fact, I said, "The family has to know that. And the only way that he will ever know that is to observe and see the body."
>
> This Court has characterized the Christian burial technique as "a blatantly coercive and deceptive ploy." *Roman v. State*, 475 So.2d 1228, 1232 (Fla. 1985). As in *Roman*, however, we find the sergeant's reference to finding the body so that it could be buried insufficient to make an otherwise voluntary statement inadmissible. The police read *Hudson* his rights at least twice, and Hudson indicated that he understood them before waiving them. The only promise made to Hudson was that he would be taken away from the body's location as soon as possible. We agree with the trial court that this promise did not coerce Hudson's confession. We disagree that police overreaching or coercive police conduct rendered Hudson's confession involuntary.

*Id.* at 830 (citation and footnote omitted). The present case is indistinguishable from *Walker* and *Hudson.* The detectives read Smithers his *Miranda* rights and he waived his rights. Smithers testified at the suppression hearing that he understood his rights. The record also reflects that Smithers graduated from high school. We do not find that Detective Metzgar's comments coerced Smithers' confession.

- 30 -

Next, Smithers claims that the detectives should have reread Smithers his *Miranda* rights after he made the incriminating statements to Detective Metzgar. We disagree. The detectives read Smithers his rights the previous night and he was given a written copy of his rights prior to the polygraph test. Smithers waived his rights on both occasions. Under these circumstances, it was not necessary for the detectives to reread Smithers his *Miranda* rights.

Finally, Smithers alleges that the detectives induced the confession by improperly using his wife as their agent during the interview. After Smithers made the incriminating statements to Detective Metzgar, Metzgar called Detectives Flair and Blake into the room and Flair and Blake continued the interview. Smithers insisted that his wife be present during the interview. Once inside the room, Smithers' wife encouraged Smithers to tell the truth. Smithers ultimately confessed to the crimes.

At a hearing on the motion to suppress, Smithers' wife testified that the detectives directed her to encourage her husband to talk. The detectives testified that they did not tell Smithers' wife to say anything to Smithers. In denying Smithers' motion to suppress, the trial court relied on  this Court's decision in *Lowe v. State*, 650 So.2d 969 (Fla. 1994). The facts of Lowe are as follows:

One week after the murder, two investigators that had been working on the case, Investigator Kerby and Sergeant Green, learned that Lowe and his girlfriend had gone to the Vero Beach Sheriff's Office to discuss a matter unrelated to the instant case. Already suspecting Lowe's involvement in the murder, Kerby and Green went to the sheriff"s office where they separated Lowe and his girlfriend and, after Lowe had waived his *Miranda* rights, began to question him concerning the murder of Donna Burnell. Lowe denied any involvement in the murder and eventually invoked his right to counsel. The interrogation ceased and Lowe was left alone in the interrogation room. Neither Kerby nor Green bothered to put Lowe in contact with an attorney because, as they were to later testify, they did not expect to continue the questioning.

Throughout the interrogation, Lowe's girlfriend had been sitting in a nearby room and had overheard much of the conversation. She became emotional and was moved to another room. After Kerby and Green left Lowe, they went to the room where the girlfriend was waiting and, at her request, explained to her the extent of the evidence they had compiled against Lowe.

The girlfriend stated to the investigators that she wanted to speak to Lowe to find out what happened. She also agreed to have her conversation with Lowe recorded. Kerby later testified that, although no one urged the girlfriend to speak to Lowe, he knew there was "a good possibility" that she was going to try to get Lowe to admit his involvement in the murder.

The girlfriend succeeded in convincing Lowe to speak to the police. When Kerby returned to the interrogation room to get the girlfriend, Lowe, without prompting, told Kerby that he wanted to speak with him again. Lowe then gave the investigators a statement in which he confessed that he was the driver of the getaway car involved in the crime but denied any complicity in the murder, which he blamed on one of two alleged accomplices.

650 So.2d at 972 (footnote omitted). This Court in *Lowe* concluded that the trial judge did not err in admitting Lowe's incriminating statement because the police did not employ the girlfriend as an agent to coerce a confession from Lowe.

We agree with the trial court below that the detectives did not coerce Smithers into giving his confession. Importantly, it was Smithers, and not the detectives, who requested that his wife be present during the interrogation. Accordingly, it cannot be said that the detectives used Smithers' wife to coerce Smithers.

Finally, in *Lukehart v. State*, 776 So.2d 906, 920 (Fla. 2001), this Court stated that when considering the validity of a confession, a reviewing court should consider the totality of circumstances surrounding the giving of the confession. After considering the totality of circumstances in the present case, including all of Smithers' alleged claims of error, we nevertheless find that Smithers' confession was given freely and voluntarily.

*Smithers*, 826 So. 2d at 924-27.

Smithers has failed to establish any unreasonableness in the state court rejection of this claim. He does not dispute any of the state court factual findings. Clearly there is no conflict with *Miranda* itself, as the relevant warnings were expressly provided to Smithers and the state courts properly found that Smithers validly waived his rights prior to making

the statements at issue. The only other case cited by Smithers is *Brewer*, but that case is simply a straightforward application of *Miranda*. In *Brewer*, the defendant was arrested and represented by counsel when the police transported him across Iowa, after agreeing that they would not question him on the trip. However, the police used a "Christian burial" speech designed to elicit incriminating statements, which the state courts had found tantamount to an interrogation. The obvious distinction in the instant case is that Smithers entered a knowing, voluntary and intelligent waiver of his constitutional rights before making the statements at issue. A less obvious distinction exists in that *Brewer* was decided under pre-AEDPA habeas law, where the federal courts simply disagreed with the state courts on the legal issue of whether Brewer had waived his rights by discussing the case. At any rate, the instant case is both factually and legally different from *Brewer*, and no habeas relief is compelled by that decision.

Smithers has failed to make a substantial showing of any constitutional violation in ground two, and ground two does not warrant habeas corpus relief.

### GROUND THREE: Absence from Pretrial Hearing

Smithers asserts that his absence from a pretrial hearing constituted a violation of his constitutional rights. (Petition, pp. 7-8; Memorandum, pp. 9-10)

Smithers has failed to establish any basis for habeas relief, as the state court resolution of this issue was not contrary to, or an unreasonable application of, established federal law.

Smithers cites a number of United States Supreme Court cases, including *Faretta v. California*, 422 U.S. 806 (1975), *Snyder v. Massachusetts*, 291 U.S. 97 (1934), *Delaware*

*v. Van Arsdall*, 475 U.S. 673 (1986), *United States v. Hasting*, 461 U.S. 499 (1983), and

*Chapman v. California*, 386 U.S. 18 (1967), to identify the relevant established federal law,

but those authorities are not offended in any way by the facts of this case.

The Florida Supreme Court resolved this claim as follows:

In Smithers' third claim, he contends that fundamental error occurred when defense counsel waived Smithers' presence at a pretrial hearing. On December 7, 1998, the trial court held a pretrial hearing on two of Smithers' motions in limine. Defense counsel orally waived Smithers' presence at the hearing.

In the first motion in limine, the defense sought to limit the showing of a video of the crime scene and the medical examiner reviewing the bodies. During the hearing, the State agreed with the defense that the video should be redacted to only show the crime scene. The trial court reserved ruling on this motion.

In the second motion, the defense sought to limit the testimony regarding Smithers' involvement with other prostitutes from the Luxury Motel. The defense claimed that this evidence was irrelevant and prejudicial. The State responded that one of the prostitutes (Bonnie Kruse) would testify that Smithers offered her money to go to Seffner with him. The State claimed that this was relevant to establishing why the victims were at the Whitehurst property and to explain Smithers' modus operandi. No witnesses testified during the hearing on the motion in limine. At the conclusion of the hearing, the trial court denied the motion. Smithers claims in this appeal that his absence during the second motion in limine amounted to fundamental error.

At trial, the State presented the testimony of three prostitutes who worked with the victims. Prior to the testimony, the defense renewed its objection to the admission of testimony concerning Smithers" sexual conduct. The trial court denied the motion.

Florida Rule of Criminal Procedure 3.180(a) states that "the defendant shall be present ... at any pretrial conference, unless waived by the defendant in writing." In *Pomeranz v. State*, 703 So.2d 465, 471 (Fla. 1997), this Court held that the trial court erred in holding a pretrial conference in the absence of the defendant without an express written waiver. However, in *Kearse v. State*, 770 So.2d 1119, 1124 (Fla. 2000), this Court stated that such violations

are subject to harmless error analysis and the proceeding will only be reversed on this basis if "fundamental fairness has been thwarted."

The State claims that any error was harmless. The State relies on this Court"s opinion in *Roberts v. State*, 510 So.2d 885 (Fla. 1987):

> During the afternoon session of October 24, the following motions were considered: (1) The defendant's motion for a daily transcript of the trial-denied; (2) Defendant's motion to strike a/k/a on indictment-denied, later granted; (3) Defendant's motion concerning death penalty questions during voir dire and to empanel a separate sentencing jury-denied; (4) Defendant's motion for psychological evaluation of Michelle Rimondi-granted with limitations; (5) Defendant's request for presentence investigation-ruling withheld; (6) Defendant's motion for list of sentencing witnesses and exhibits-passed with court's comment that defendant had an "absolute right" to that information; (7) Defendant's motion to reopen depositions of Rimondi and others-granted with limitations; (8) Defendant's motion to prohibit dispersal of jury during recess-granted; (9) Defendant's motion to seek sequestration of jury-ruling withheld; (10) Defendant's motion concerning comments on his right to counsel-granted. During the December 2 conference the following motions were heard: (1) The defendant's motion to reopen the deposition of Denise Moon, Rimondi's rape counselor-denied; (2) Defendant's motion to restrict use of other crime evidence-granted; (3) Defendant's motion for release of grand jury transcript-denied; (5) State"s motion to limit cross-examination of state witness Campbell-granted; (6) State's motion to limit cross-examination of state witness Rimondi-granted; (7) State's motion to limit inquiry into Rimondi"s social history-ruling reserved, eventually granted. *Although a number of the rulings on these motions were adverse to Roberts, each of the motions heard during these sessions involved matters in which Roberts, if present, could not have assisted defense counsel in arguing.* Therefore, we find that the state has met its burden in showing that, if in fact the defendant was not present during these proceedings, he was not prejudiced.

*Id.* at 891 (emphasis added).

We agree with Smithers that the trial court erred in holding the pretrial motion in limine hearing in his absence without an express written waiver.

- 35 -

> Nevertheless, we find the error harmless as we do not find that fundamental fairness was thwarted due to Smithers' absence. No witnesses testified during the hearing in question. It is doubtful that Smithers' input would have impacted the trial court's ruling on the motion. Further, the trial court's ruling on the motion was correct, as Kruse's testimony regarding Smithers' offer to go to Seffner was relevant to the State's case. Finally, Smithers was present at trial when all of the witnesses in question testified; hence, Smithers was not denied the opportunity to voice any concerns.

*Smithers*, 826 So. 2d at 927-28.

No constitutional error has been offered in this issue. Notably, the Florida Supreme Court found that Smithers had a state procedural right to be present at the pretrial hearing, but that his absence in this case was harmless to the defense case. Rather than challenge that ruling, Smithers merely cites to a number of federal cases which do not compel habeas relief.

In *Snyder*, the Court held that due process required a defendant to be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," or, put another way, a defendant's presence is required "to the extent that a fair and just hearing would be thwarted by his absence." *Snyder*, 291 U.S. at 105-06, 108; *see also Kentucky v. Stincer*, 482 U.S. 730 (1987) (rejecting due process violation where defendant was not present at jury view). The Florida Supreme Court's rejection of this issue cannot be contrary to *Snyder*, or an unreasonable application of that decision, since that court found that Smithers' absence from the pretrial hearing was error under state law.

The other cases cited by Smithers are not relevant to the situation presented in his case. Smithers' reliance on *Faretta* is misplaced, since Smithers was never denied the

opportunity to represent himself at trial. In *Van Arsdall* and *Hasting*, the Court simply applied the harmless error standard of *Chapman* to the particular constitutional violations identified -- the right of confrontation in *Van Arsdall*, and the right to remain silent in *Hasting*. In *Chapman*, the Court addressed the proper harmless error analysis to be conducted when constitutional error is presented.

However, at this point in Smithers' litigation, *Chapman* and the cases applying it are not applicable. In habeas proceedings, even where the state courts applied *Chapman*, the relevant harmless error standard is outlined in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (*Brecht* applies to determine if error is harmless in habeas, even where state court applied *Chapman*); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (noting habeas petition could not be granted if state court "simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the Ohio Court of Appeals applied harmless-error review in an 'objectively unreasonable' manner"); *Grossman v. McDonough*, 466 F.3d 1325, 1339-41 (11th Cir. 2006) (reviewing denial of habeas relief under AEDPA, applying *Brecht* for consideration of constitutional error found harmless when the Florida Supreme Court applied *Chapman* on direct appeal). Because Smithers has not pled, let alone demonstrated, any "actual prejudice," meaning that the error "had substantial and injurious effect or influence in determining the jury's verdict," under *Brecht*, he is not entitled to habeas relief.

Smithers has failed to demonstrate that the state court resolution of this claim was objectively unreasonable. Ground three does not warrant habeas corpus relief.

**GROUND FOUR:**

**Application of  Heinous, Atrocious or Cruel [HAC] Aggravating Factor**

Smithers asserts constitutional error in the application of the heinous, atrocious or cruel aggravating factor (HAC), alleging that the factor was not supported by the facts and that the factor is unconstitutionally vague. (Petition, pp. 8-9; Memorandum, 10-12)

This claim is unexhausted and procedurally barred.  This issue was asserted in state court as a violation of state law, and no federal constitutional claim was presented or exhausted. Smithers' state court challenge to this factor did not assert that the factor was unacceptably vague, but only alleged that it was not supported factually in this case. (Ex. A30/69-74) Accordingly, summary rejection is proper. *Baldwin* v. Reese, 541 U.S. 27, 32 (2004); *Duncan v. Henry*, 513 U.S. 364, 365 (1995).

<u>Claim Has no Merit</u>

Smithers has failed to establish any basis for habeas relief, as the state court resolution of this issue was not contrary to, or an unreasonable application of, established federal law. Smithers claims that the evidence did not demonstrate that  Denise Roach was conscious during the attack; he also claims the state courts did not apply the narrow construction for HAC which is constitutionally required and that the jury was not given adequate guidance, citing *Espinosa v. Florida*, 505 U.S. 1079 (1992), and *Sochor v. Florida*, 504 U.S. 527 (1992), along with other jury instruction cases from the United States Supreme Court. The unexhausted jury instructional error which he alleges is clearly without merit, as his jury received the comprehensive instructions adopted by the Florida Supreme Court to cure the error identified in *Espinosa*. See Ex. A18/2330-31, 2339.

The state court rejection of Smithers' state claim of factual insufficiency on HAC

outlines the relevant facts which compel the application of this factor:

> In claim four, Smithers challenges the trial court's finding of HAC for the Roach murder. A trial court's ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent, substantial evidence in the record. *See Almeida v. State*, 748 So.2d 922, 932 (Fla. 1999). In order for HAC to apply, the murder must be conscienceless or pitiless and unnecessarily torturous to the victim. *See Hartley v. State*, 686 So.2d 1316, 1323 (Fla. 1996). A finding of HAC is appropriate only when a murder evinces extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. *See Cheshire v. State*, 568 So.2d 908, 912 (Fla. 1990).

> The record demonstrates that although Smithers and Roach had sex inside the Whitehurst house, Roach was murdered in the carport. Blood stains on the carport wall were consistent with Roach's DNA. The medical examiner testified that Roach's death was caused by the combined effects of strangulation, stab wounds, and blunt impact to the head. There were two slits in Roach's clothing which were caused by a sharp instrument. Her face and skull were fractured due to multiple blunt impact wounds. There were also sixteen puncture wounds to her skull, several of which completely penetrated the skull. Finally, she also had injuries consistent with manual strangulation (the hyoid bone was fractured).

> Smithers told the detectives that he got into an argument with Roach that resulted in him hitting her several times. Smithers testified at trial that someone else killed Roach, but as the trial court points out in its sentencing order, this testimony was rejected by the jury. Based on this record, there is competent, substantial evidence to support HAC.

*Smithers*, 826 So. 2d at 928-29.

On these facts, the state courts correctly concluded that Roach's murder was

conscienceless, pitiless, and unnecessarily torturous to the victim, and that it evinced

extreme and outrageous depravity. The trial court's order applying this factor specifically

noted that Smithers testified that Roach was "alive, conscious and screaming" as she was

- 39 -

struck with an axe (Ex. A2/247), and Roach's injuries and Smithers' confession to the detectives all refute his current suggestion that the State failed to establish that Roach was conscious at the time of the attack. Clearly, the rejection of Smithers' appellate argument that the evidence was insufficient to support this factor under state law was objectively reasonable.

The unexhausted, barred claim that HAC was applied in an unconstitutionally vague manner is also without merit. The United States Supreme Court has outlined the relevant analysis when habeas petitioners challenge the purported vagueness of an aggravating factor to support the death penalty. In *Walton v. Arizona*, 497 U.S. 639, 654 (1990), the Court held:

> When a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide some guidance to the sentencer.

In Smithers' case, as noted above, the jury received complete instructions to narrowly define the HAC aggravator in accordance with Florida law. (Ex. A18/2330-31, 2339). In addition, the United States Supreme Court has expressly acknowledged that in Florida, a narrow definition of HAC has been adopted by the state courts, which are presumed to know and to follow the law. *Lambrix v. Singletary*, 520 U.S. 518, 532, n.4 (1997); *Profitt v. Florida*, 428 U.S. 242, 255 (1976). Thus, application of the HAC factor is constitutional and Smithers is not entitled to any relief.

The application of this valid factor was compelled in this case, and the finding of HAC in support of Smithers' death sentence was not contrary to, or an unreasonable application of, any established federal law.

Smithers' allegation in his memorandum of law that neither the State nor the court addressed the constitutionally required narrowing construction of the heinous, atrocious or cruel aggravating circumstance does not mirror what happened in this case.  (See discussion above).  Smithers' allegation that the terms of HAC were not defined in any cogent manner and a reasonable juror could believe any murder to be heinous, atrocious or cruel is erroneous, given the facts of this case and the United States Supreme Court's approval of Florida's narrowed definition of HAC.

Ground four does not warrant habeas corpus relief.

### GROUND FIVE:
### Application of the Cold, Calculated and Premeditated [CCP] Aggravating Factor

Smithers asserts constitutional error in the application of the cold, calculated and premeditated aggravating factor (CCP), alleging that the factor is unconstitutionally vague. (Petition, pp. 10-11; Memorandum, pp. 12-15)

This claim is unexhausted and procedurally barred. This issue was raised in state court as a violation of state law, and no federal constitutional claim was presented or exhausted. In addition, Smithers' state court challenge to this factor did not assert that the factor was unacceptably vague, but only alleged that it was not supported factually in this case. (Ex. A30/75-80). *Baldwin*, 541 U.S. at 32; *Duncan*, 513 U.S. at 365.

<u>Claim Has no Merit</u>

Smithers has failed to establish any basis for habeas relief, as the state court resolution of this issue was not contrary to, or an unreasonable application of, established federal law. Smithers' federal habeas claim again disputes the sufficiency of the evidence to support this aggravator as well as challenging the purported vagueness of the jury instruction. Once again, the state court factual findings compel the application of this factor, as the evidence established a pattern of taking prostitutes to the Whitehurst property for sex, luring them to the carport to be killed, and then dumping the bodies in the lake on the property. The sentencers were not required to reject the evidence of a careful plan based on Smithers' self-serving testimony that he argued with Christy Cowan about money prior to her murder.

The state court rejection of Smithers state claim of factual insufficiency on CCP outlines the relevant facts which compel the application of this factor:

> In claim five, Smithers challenges the trial court's finding of CCP for the Cowan murder. In order to prove the existence of the CCP aggravator, "the State must show a heightened level of premeditation establishing that the defendant had a careful plan or prearranged design to kill." *Bell v. State*, 699 So.2d 674, 677 (Fla. 1997). The State attempted to prove this aggravator for the Cowan murder by establishing that Smithers murdered Roach in a similar fashion in the previous seven to ten days. The trial court stated the following in the sentencing order:
>
> > When Samuel Smithers drove Cristy Cowan to the property, he knew that he had killed Denise Roach; he knew that her body was still on the property; he knew that he had only $26 on his person to pay for sex; he locked the gate behind him after he drove onto the property. His premeditated design to kill Cristy Cowan was heightened beyond a reasonable doubt. His actions demonstrated a cool and calm reflection.

The State's argument is strengthened by the fact that the murder was not committed during sex, as the condom wrapper that Cowan was carrying was found in the house but Mrs. Whitehurst saw a pool of blood in the carport. Thus, the case is distinguishable from those cases where the victim was killed while the victim and the defendant were engaged in sexual activity. *See, e.g., Randall v. State*, 760 So.2d 892 (Fla. 2000) (holding that evidence of defendant's history of choking women to heighten sexual arousal did not prove premeditation). The State's argument is further strengthened by the identical manner in which the two murders were committed. Both women were prostitutes, both were picked up at the same location and taken to the Whitehurst property, and, after having a sexual encounter with Smithers, both were lured into the carport, seemingly murdered with tools kept in the carport, and then dragged into the same pond. The time between the murders was a matter of days. Had Smithers only intended to have sex with Cowan, there would have been no need to leave the Luxury Motel. Rather, when Smithers picked up Cowan and asked her to come with him to the Whitehurst property, he was taking the first step towards committing the same crime that he committed just days earlier, and the same location was accessible, the same murder weapons were already in place, and the same hiding place existed for the body.

This case is distinguishable from *Crump v. State*, 622 So.2d 963 (Fla. 1993). In *Crump*, the police found the nude body of a prostitute in an open area adjacent to a cemetery in Tampa. An initial examination of the body showed that the woman had been manually strangled and had ligature marks on her wrists consistent with being bound. Ten months later, the police found the nude body of another prostitute in an open field adjacent to a different cemetery in Tampa. The second woman also had been manually strangled and had ligature marks on her wrists consistent with having been bound. Crump was linked to both murders. On appeal, his Court held that the trial court erred in finding CCP for the second murder:

> In the sentencing order, the trial judge relied on the *Williams v. State*, 110 So.2d 654 (Fla. 1959) rule evidence to show that heightened premeditation exists. We find that the State did not prove beyond a reasonable doubt that Crump had a careful prearranged plan to kill the victim before inviting her into his truck.

*Id.* at 972 (footnote omitted). Although the two murders in *Crump* were committed in a similar manner, they were not identical, as the two women were discovered in different locations. Further, in comparison to the instant

case, there was a substantial amount of time separating the two crimes in *Crump*.

      For all of these reasons, we find no merit to Smithers' CCP claim. There is competent, substantial evidence in the record to support the existence of the CCP aggravator for the Cowan murder.

*Smithers*, 826 So. 2d at 929-30.

On these facts, the state courts correctly concluded that Cowan's murder was committed with heightened premeditation and that Smithers had a careful plan or prearranged design to kill. Moreover, Smithers' unexhausted vagueness challenge is also without merit, as an expanded, comprehensive instruction was provided to the jury which no court has ever determined to have been deficient or improper. (Ex. A18/2331-32) Smithers is seeking an expansion of the *Espinosa* vagueness doctrine to the aggravating factor that the murder was committed in a cold, calculated and premeditated manner. In *Jones v. United States*, 527 U.S. 373, 398-402, n.15 (1999), the United States Supreme Court noted the limited nature of the *Espinosa* decision with regard to vagueness challenges directed at jury instructions defining other aggravating factors. ("We reiterate the point we made in *Tuilaepa v. California*, 512 U.S. 967, 129 L. Ed. 2d 750, 114 S. Ct. 2630 (1994) -- we have held only a few, quite similar factors vague, see, e.g., *Maynard v. Cartwright*, 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988) (whether murder was 'especially heinous, atrocious, or cruel'), while upholding numerous other factors against vagueness challenges").

Federal review of a vagueness challenge is highly deferential, and "[a]s long as an aggravating factor has a core meaning that criminal juries should be capable of

understanding, it will pass constitutional muster." *Jones*, 527 U.S. at 400. However, even presuming some deficiency in the instruction, any possible constitutional error was cured when the Florida Supreme Court, which knows and applies a constitutional construction, upheld this factor on appeal. *Bell v. Cone*, 543 U.S. 447, 452-457 (2005); *Lambrix*, 520 U.S. at 532, n.4; *Bell v. State*, 699 So. 2d 674, 677 (Fla. 1997) (defining CCP).

The application of this valid factor was compelled in this case, and the finding of CCP in support of Smithers' death sentence was not contrary to, or an unreasonable application of, any established federal law.

**Smithers did not refute Respondent's merits argument in his reply brief.**

Ground five does not warrant habeas corpus relief.

### GROUND SIX: Denial of Motion for Mistrial

Smithers disputes the denial of his request for a mistrial when a State expert witness commented on Smithers' lack of remorse. (Petition, pp. 11-12; Memorandum, pp. 15-16)

Ground six is unexhausted and procedurally barred because Smithers raised the issue in state court as a violation of state law, and no federal constitutional claim was fairly presented or exhausted. (Ex. A30/81-82). *See Baldwin*, 541 U.S. at 32; *Duncan*, 513 U.S. at 365.

### Claim Has no Merit

The state court resolution of this issue was not contrary to, or an unreasonable application of, established federal law. Smithers' habeas petition does not identify any alleged constitutional error or established federal law to be applied. His allegations only suggest impropriety under state law, rendering this issue facially insufficient. *Washington*,

- 45 -

324 F.3d at 1265-66; *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Moreover, the Florida

Supreme Court properly found that a mistrial was not required under state law:

> In claim six, Smithers alleges that the trial court erred by failing to declare a mistrial during the penalty phase when one of the State's witnesses testified regarding Smithers' lack of remorse. During the penalty phase of the present case, State witness Dr. Stein, a forensic psychiatrist, stated the following:

>> Q. And what psychiatric diagnosis did you make on Mr. Smithers?

>> A. Well there really is not a psychiatric diagnosis because there is not a psychiatric disorder. Mr. Smithers based on all the evidence in the case that I reviewed has what we call antisocial personality traits. Those are personality traits that are characterized by a person being likely to be deceptive and to lie, to have lack of remorse for others, to be what we call....

> Defense counsel immediately objected and requested a mistrial. The trial court denied the motion but instructed Dr. Stein to refrain from referring to lack of remorse. Lack of remorse was not mentioned again either by the witness or by the State.

> A ruling on a motion for a mistrial is within the sound discretion of the trial court and should be "granted only when it is necessary to ensure that the defendant receives a fair trial." *Gore v. State*, 784 So.2d 418, 427 (Fla. 2001). The use of a harmless error analysis under *State v. DiGuilio*, 491 So.2d 1129 (Fla. 1986), is not necessary where "the trial court recognized the error, sustained the objection and gave a curative instruction." *Gore*, 784 So.2d at 428. Instead, the correct appellate standard of review is abuse of discretion. See *id.*

> In *Shellito v. State*, 701 So.2d 837, 842 (Fla. 1997), this Court stated that lack of remorse is a nonstatutory aggravating circumstance and cannot be considered in a capital sentencing. However, the Court further stated that "the brief reference to lack of remorse was of minor consequence and constituted harmless error." *Id.* Similarly, in the instant case, Dr. Stein's brief reference to lack of remorse was of minor consequence, especially in light of the fact that the State did not mention lack of remorse in its closing argument.

> Hence, the trial court did not abuse its discretion in denying Smithers' motion
> for mistrial.

*Smithers*, 826 So. 2d at 930-31.

Smithers does not attempt to demonstrate that this ruling was premised on any unreasonable determination of facts, nor does he assert that the claim is contrary to, or an unreasonable application of, any established federal law.

Ground six does not warrant habeas corpus relief.

### GROUND SEVEN: Ineffective Assistance of Counsel, Guilt Phase

Smithers asserts that he was denied his Sixth Amendment right to the effective assistance of counsel in the guilt phase of his capital trial. Specifically, he asserts that counsel performed deficiently in jury selection by failing to strike juror Collins, and that counsel was also deficient in failing to preclude testimony of racial bias from state witness Detective Dorothy Flair. Smithers also alleges prejudice. (Petition, pp. 12-14; Memorandum, pp. 17-25)

The state courts resolved this claim by application of *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smithers*, 18 So. 3d at 463. As that is the correct established federal law to be applied under AEDPA, the state court ruling cannot be contrary to the relevant precedent. In addition, Smithers has failed to demonstrate that the denial of this claim was unreasonable. He has not alleged that the state courts based their rulings on any unreasonable determination of facts, or that they unreasonably applied *Strickland* to the facts as found.

The Florida Supreme Court denied this claim as follows:

- 47 -

## A. Failure to Strike Prospective Juror

Smithers argues that the postconviction court erred in denying his claim that trial counsel was ineffective for not challenging juror Collins for cause based on statements made by Collins during voir dire concerning his views on the death penalty. Because the full context of Collins' statements does not show that Collins was actually biased, we conclude that the postconviction court did not err in denying this claim.

In *Carratelli v. State*, 961 So.2d 312, 324 (Fla. 2007), this Court held that "where a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased" to be entitled to relief. Without a showing of such actual bias of the juror, the defendant cannot establish the prejudice required by *Strickland.* The Court explained in *Carratelli* that

> actual bias means bias-in-fact that would prevent service as an impartial juror. Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial-i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record.

*Id.* (citation omitted).

In *Owen v. State*, 986 So.2d 534 (Fla. 2008), this Court applied the *Carratelli* standard to a claim that trial counsel was ineffective for not exercising a cause or a peremptory challenge to strike a potential juror. The Court held that there was no evidence of bias in the record where a juror stated that she "[p]robably" would vote for the death penalty in the circumstance of multiple victims but ultimately stated that mitigating evidence such as testimony about the defendant's mental health could influence her to recommend a life sentence. *Id.* at 550.

In this case, the defense argues that the following exchange gave counsel reason to challenge juror Collins for cause.

> MR. ROBBINS: Okay, I guess the same questions, can you conceive of circumstances that you think might be worth considering as far as mitigating circumstances, things involving either people's mental or physical circumstances, upbringing, those sorts of things?

PROSPECTIVE JUROR COLLINS: I guess it depends if the person is abused as a kid or something, I don't know. But if they are guilty without a doubt they should get the death penalty.

MR. ROBBINS: If someone is found guilty and you are totally convinced they are guilty of the offense whatever that particular murder case is about, do you feel that there could ever be any other sentence except the death penalty for first degree murder?

PROSPECTIVE JUROR COLLINS: Maybe life without parole.

MR. ROBBINS: Those are the two choices by the way, life without parole or the death penalty. But what I'm asking is do you feel there could be circumstances where you vote for a recommendation for life?

PROSPECTIVE JUROR COLLINS: Yes, if I have to.

Juror Collins' statements did not show a biased unwillingness to consider potential sentences other than death. Rather, similar to the comments considered in *Owen*, juror Collins expressed that he could consider life without parole as a possible sentence for first-degree murder and that if under Florida law the circumstances compelled a life recommendation, he would recommend life. Thus, the record does not demonstrate actual bias that would prevent juror Collins from serving as an impartial juror. Accordingly, the postconviction court did not err in denying this claim. [FN2]

[FN2] To the extent that Smithers argues that trial counsel was ineffective for failing to question juror Collins about potential mitigation, his argument is procedurally barred and without merit. Smithers did not raise that argument before the postconviction court. *See Green v. State*, 975 So.2d 1090, 1104 (Fla. 2008). Moreover, in *Green*, this Court held that an allegation that further questioning would have established a basis for a cause challenge was "speculative" and not a basis for relief. *Id.* at 1105.

*Smithers*, 18 So. 3d at 464-65.

Smithers' pending federal claim repeats his allegation that trial counsel failed to

adequately question Collins about mitigation, but the Florida Supreme Court found that

aspect of the case to be procedurally barred, and Smithers' has not identified any questions that should have been asked; this aspect of his claim is not properly before the Court and should not be considered.

As to the state courts' finding that Juror Collins was not biased, Smithers directs this Court to *Morgan v. Illinois*, 504 U.S. 719 (1992). The state trial judge considered *Morgan* and expressly held that Smithers' case was distinguished factually, noting that Collins never stated that he would automatically vote for the death penalty. (Ex. C2/314) The court expressly found that "[i]t is clear from the record that juror Collins would not recommend death regardless of the facts and circumstances of a conviction." In contrast to the contention that the juror was "automatically" in favor of the death penalty, the trial court found that "juror Collins stated he understood that the death penalty is not to be considered in every case, and that he was 'not totally for it or against it.'" (Ex. C2/314-16) Because *Morgan* is factually different, it does not compel habeas relief on this issue. *See also Patton v. Yount*, 467 U.S. 1025, 1038-40 (1984) (ambiguous voir dire answers were of concern, but trial judge was appropriate person to resolve).

Moreover, as this claim must be considered in the context of ineffective assistance of counsel, the relevant federal law to be applied is *Strickland*, not *Morgan. See Williams v. Taylor*, 529 U.S. 362, 416 (2000). In denying this claim, the trial court observed that counsel had testified at the evidentiary hearing as to his strategy in declining to contest Collins as a juror. (Ex. C2/315-16) Counsel's explanation of how he selected jurors and why he would not have removed juror Collins establishes that this is not a case where counsel simply overlooked a potentially biased juror's response but, rather, reflects a reasonable

strategic decision based on his considerable expertise with jury trials. *Strickland*, 466 U.S. at 690 (strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.) The trial court's finding that counsel performed reasonably and was not deficient at voir dire (Ex. C2/316) is objectively reasonable and defeats this claim.

Even if defense counsel's conclusion that he did not have grounds to strike juror Collins for cause was unreasonable, Smithers must still establish prejudice, i.e. that there is a reasonable probability that the result of the proceeding would have been different. The Florida Supreme Court"s rejection of this issue, as recited above, focused on Smithers' failure to establish that any biased juror was empaneled in this case. In contrast to the Florida Supreme Court finding that a defendant has not shown prejudice based on counsel's deficient performance in jury selection unless a bias juror actually sat on the case, Smithers cites *Bertolotti v. Dugger*, 883 F.2d 1503, 1519 (11th Cir. 1989),[1] asserting prejudice can be shown under *Strickland* as long as one juror could potentially offer a different recommendation as to sentence.

*Bertolotti* does not demonstrate that the Florida Supreme Court rejection of potential prejudice was unreasonable, as *Bertolotti* does not discuss the issue of prejudice in the context of selecting a jury. Since the juror challenge herein is related entirely to juror Collins' ability to recommend a death sentence, and since the death recommendation in this case was twelve to zero, there is no possibility that, even if Collins could have been

---

[1] *Bertolotti* cannot provide "established federal law" on this point for AEDPA purposes, since it is not a decision from the United States Supreme Court.

replaced with a juror that returned a life recommendation, the outcome of Smithers' penalty

phase would have been any different. On the facts of this case, the jury would have

recommended a death sentence, although the recommendation would have been eleven

to one. The state courts' finding that Smithers failed to demonstrate the necessary

prejudice is clearly reasonable, and no basis for habeas relief has been offered.

The second subclaim of this ground for relief is also without merit. Smithers alleges

that counsel performed deficiently in failing to prohibit testimony of his racial bias, admitted

when the State presented evidence of Smithers' confession to law enforcement. As to this

subclaim, the Florida Supreme Court stated:

### B. Failure to Seek Exclusion of a Portion of Smithers' Confession

Smithers alleged that defense counsel Daniel Mario Hernandez was
ineffective for not making a motion to exclude a portion of Smithers'
confession. During the guilt phase, Detective Dorothy Flair, also known as
Detective Martinez, testified that she interviewed Smithers on the night that the
bodies were discovered and on the following day. She testified to the
substance of both interviews, including the following description of Smithers'
statements about the murder of Denise Roach:

Q. Okay. What was his response to her hitting him on the
shoulder or the arm?

A. He told her that she wasn't going to hit him and he said he got
upset about it.

Q. Did he tell you whether or not he hit her in any part of her
body?

A. He said he hit her several times with a fist, with his first [sic].

Q. And did he tell you where on the body?

A. In her face and head.

Q. Did he tell you--Did he make any comments as to whether or not he had hit her again?

A. After that, yes.

Q. *Yes. Did anything kick in that make her-- made him hit her again?*

A. *He said that some prejudice may have set in so he hit her again.*

Q. *And this is because she was black?*

A. *Yes.*

Q. After he hits her again does he tell her that he is going to call the police?

A. Yes.

Q. And does he tell you how she reacts?

A. She throws the planter against his truck.

(Emphasis added.) After this exchange, Detective Flair testified concerning Smithers' statements about the additional injuries he inflicted on Roach.

During the postconviction evidentiary hearing, trial counsel Hernandez testified that at the time of trial, he considered the fact that Smithers may have been prejudiced against the victim to be "inextricably intertwined with the facts of the case." He explained that it was only "in retrospect" that he recognized that he could have filed a nonfrivolous motion to exclude the prejudice comment on the basis that the danger of unfair prejudice outweighed the probative value. Because the postconviction court found that it was "reasonable professional judgment of counsel to believe the racial bias was inextricably intertwined with the crime charged," the court concluded that trial counsel was not deficient. The postconviction court also concluded that Smithers did not establish that the admission of the statement "was so prejudicial that confidence in the outcome was undermined."

Even if an objection to the admission of this portion of Smithers' statement would have been meritorious-which we do not decide-we conclude that Smithers has not established the requisite prejudice under the *Strickland*

standard. Considering "the totality of the evidence," we conclude that Smithers has not "met the burden of showing that the decision reached would reasonably likely have been different absent" the admission of Smithers' comment regarding his racial prejudice. *Strickland*, 466 U.S. at 695-96, 104 S.Ct. 2052.

Detective Flair's testimony about Smithers' statement to law enforcement officers spanned nearly thirty pages in the record. Detective Flair testified that Smithers admitted to beating and killing Roach and Cowan and to attempting to dispose of their bodies in a pond. The challenged comment was only a few lines of the testimony about Smithers' detailed admission. In addition, other evidence connected Smithers to the murders. Smithers and Cowan were seen together on a convenience store videotape filmed about an hour before Whitehurst discovered the pool of blood in the carport. Shoe prints by the pond matched the shoes found in Smithers' home. Smithers' fingerprint was found in the kitchen of Whitehurst's house, and Smithers could not be excluded as the contributor of a semen stain that was found in the house. *Smithers*, 826 So.2d at 919. Furthermore, the State did not mention the possible racial motivation for the murder during its guilt-phase closing argument, and thus the jury was not reminded of the challenged testimony before deliberating. Given the persuasive evidence that Smithers committed the murders and the fact that the State did not emphasize the challenged testimony during closing, there is no reasonable probability that the jury improperly convicted Smithers of either murder due to his expression of racial bias, rather than properly convicted him based on the evidence of his guilt. Trial counsel's alleged deficiency does not undermine confidence in the verdict.

As for sentencing, the State alluded to the evidence of racial bias once in its penalty-phase closing argument. The prosecutor used the phrase "I guess prejudice set in" when paraphrasing Smithers' statement about the Roach murder. Smithers asserts that the evidence influenced at least one juror's decision to recommend death.

In *Robinson v. State*, 520 So.2d 1, 7 (Fla. 1988), a direct appeal, we stated that "the risk of racial prejudice infecting a criminal trial takes on greater significance in the context of a capital sentencing" where the jury is called upon to make a "highly subjective" evaluation. The facts presented in *Robinson* were, however, very different from the facts presented here. In Robinson, we concluded that "the prosecutor's examination of [a] witness was a deliberate attempt to insinuate that [the defendant] had a habit of preying on white women and thus constituted an impermissible appeal to bias and prejudice." *Id.* at 6. We further concluded that the error could not be deemed

harmless because we could not "presume that the prejudicial testimony did not remain imbedded in the minds of the jurors and influence their recommendation." *Id.* at 8. The passing reference to Smithers' statement concerning his prejudice is of a different character than the prosecutor's calculated attempt in *Robinson* to play on any racial prejudice held by the jurors.

Our decision in *State v. Davis*, 872 So.2d 250 (Fla. 2004), is also readily distinguishable. In *Davis*, defense counsel, during voir dire of a panel of prospective jurors, said: "Sometimes I just don't like black people. Sometimes black people make me mad just because they're black." *Id.* (emphasis removed). We concluded that Davis was entitled to postconviction relief because "the expressions of racial animus voiced by trial counsel during voir dire so seriously affected the fairness and reliability of the proceeding that our confidence in the jury's verdicts of guilt [wa]s undermined." *Id.* at 253. The improper and inflammatory comments made by defense counsel in *Davis* are very different from the comment made by Smithers which is at issue here.

Moreover, Smithers does not address how the comment could have affected the evaluation of the aggravating and mitigating factors by the jury or the sentencing court. *See Jones v. State*, 998 So.2d 573, 585 (Fla. 2008) ("'Prejudice ... is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings.' " (quoting *Gaskin v. State*, 737 So.2d 509, 516 n. 14 (Fla. 1999))). As discussed above, admission of the evidence of racial bias does not undermine confidence in either of the contemporaneous murder convictions that supported the prior violent felony aggravating factors, and the evidence has no bearing on whether the aggravating factor of cold, calculated, and premeditated (CCP) was applicable to the Cowan murder. And while the comment may have supported the conclusion that Smithers acted from a particularly wicked or vile motive in the Roach murder, the comment was immaterial to whether the killing was "unnecessarily torturous to the victim." Fla. Std. Jury Instr. (Crim.) 7.11 Penalty Proceedings - Capital Cases (defining heinous, atrocious or cruel aggravating factor). In short, there is no "reasonable probability" that absent the admission of Smithers' comment concerning his racial prejudice, "the balance of aggravating and mitigating circumstances would have been different" in the eyes of either the jury--which unanimously recommended death for the murders--or the sentencing court. *Jones,* 998 So.2d at 585.

*Smithers*, 18 So. 3d 460, 465-67. Once again resolution of this claim was objectively reasonable, and Smithers' assertion of ineffective assistance of counsel in this regard has no merit.

Smithers asserts that counsel should have sought to excise his statements with regard to racial bias from the confession because the prejudicial effect outweighed any probative value, and therefore the comments should have been excluded under state law. However, the state trial judge expressly concluded that counsels' assessment at the time of trial, believing that the statements of bias would be admitted over any objection, amounted to reasonable professional judgment and not deficient performance. (Ex. C2/318). Smithers' federal claim essentially just disputes the admissibility of the statements under state law; he provides no analysis as to how the state court resolution of the claim may have unreasonably applied *Strickland* or any other basis for federal relief. In fact, the Florida Supreme Court did not even decide the issue of whether the statements would have been excluded under state law if properly challenged, finding instead that Smithers could not demonstrate any prejudice from the admission of the testimony. Because he has offered no criticism of the state court ruling with regard to prejudice, Smithers has not satisfied his burden of showing an unreasonable application of established federal law.

The evidence of Smithers' guilt was overwhelming and not seriously contested at trial. Smithers' changing stories and ultimately his testimony did not offer any credible defense to these murders, and the Florida Supreme Court carefully and convincingly explained why Smithers' current challenges to his attorneys' guilt phase performance do not shake the confidence of the guilty verdicts obtained.

**Smithers replied to Respondent's response to ground seven in Smithers' reply brief. (See Doc. 21 at pp. 4-6). Essentially, Smithers contends that the Florida courts were wrong. Smithers' argument in the reply brief is not persuasive.**

Ground seven does not warrant habeas corpus relief.

### GROUND EIGHT: Ineffective Assistance of Counsel, Penalty Phase

Smithers asserts that he was denied his Sixth Amendment right to the effective assistance of counsel in the penalty phase of his capital trial. Specifically, he asserts that counsel performed deficiently in failing to provide necessary information to his mental health expert, and that counsel should have presented an independent expert to refute the testimony of the medical examiner offered by the State. Smithers also alleges prejudice. (Petition, pp. 15-22; Memorandum, pp. 25-32)

The state courts resolved this claim by application of *Strickland v. Washington*, 466 U.S. 668 (1984). See *Smithers*, 18 So. 3d at 463. As that is the correct established federal law to be applied under AEDPA, the state court ruling cannot be contrary to the relevant precedent. In addition, Smithers has failed to demonstrate that the denial of this claim was unreasonable. He has not alleged that the state courts based their rulings on any unreasonable determination of facts, or that they unreasonably applied *Strickland* to the facts as found. Rather, he has essentially just repeated the same claim as offered to the state courts. This is insufficient under AEDPA.

Smithers raises two subclaims in this issue. In the first subclaim, Smithers asserts that trial counsel failed to adequately investigate possible mental mitigation, alleging that counsel failed to provide Dr. Maher with information about a "psychotic episode" which

would have compelled Maher to diagnose Smithers as psychotic. The state trial court expressly found counsel was not deficient with regard to preparing Dr. Maher's penalty phase testimony. (Ex. C2/339) The central issue as to whether counsel supplied the relevant information to Dr. Maher was the subject of conflicting testimony at the evidentiary hearing. While Dr. Maher testified that he did not have the investigator's report of Smithers' claim to have seen a Bentley while talking to his neighbor, trial counsel Robbins testified that he provided all of Smithers' testimony, plus all of the information he had received prior to trial, to his experts. (Ex. C8/1189) He stated specifically his belief that Maher had been aware of the investigator's memo. (Ex. C8/1217) Dr. Maher's testimony on this point is suspect, since Maher also testified that he was not aware that Smithers claimed to have heard one of the victims calling to him from the pond, while Maher's penalty phase testimony demonstrates that he did have this knowledge at the time of trial.

On this record, the trial court properly concluded that no deficient performance had been demonstrated. The Florida Supreme Court focused on the prejudice prong, finding no reasonable probability of a different result had counsel performed any differently in this regard. *Smithers*, 18 So. 3d at 468-69. The Florida Supreme Court denied this claim as follows:

### C. Failure to Adequately Investigate Mental Health Mitigation

In this claim, Smithers argues that his trial counsel was ineffective in investigating available mitigation evidence. Smithers asserts that trial counsel unreasonably failed to provide the defense's mental health expert, Michael Scott Maher, M.D., with an investigative report documenting Smithers' claim that Dean Snyder, Smithers' neighbor, was present when a man in a Bentley approached Smithers. [FN3] He further asserts that counsel unreasonably failed to interview Dean Snyder and to provide Dr. Maher with the results of

the Snyder interview. Smithers explains that Snyder's statement that he never saw the man in the Bentley was evidence of a hallucination by Smithers.

> [FN3] During the evidentiary hearing, the defense introduced a report dated September 17, 1998, from investigator Diane Fernandez to Smithers' trial attorneys. The report stated that on September 11, 1998, Smithers informed his attorneys and Fernandez that he did not kill Roach and Cowan. Smithers explained that he was approached at his home by a white male driving a Bentley. Smithers explained that the man blackmailed Smithers into allowing him to use the Whitehurst property to "conduct some business." The report indicated that Smithers stated that he was speaking with Dean Snyder when the man arrived. At the evidentiary hearing, Snyder testified that he never saw a man get out of a Bentley while he was talking to Smithers, that he believed he would remember such an event, that he was not asked by the defense to testify at trial, and that he would have been willing to testify.

The postconviction court denied this claim, concluding that trial counsel's performance was adequate because he presented two expert witnesses about Smithers' possible psychosis and additional testimony to establish mitigating factors. The postconviction court explained that "changed opinions' do not establish ineffective assistance of counsel. After reviewing the postconviction record and the trial record, we conclude that Smithers has failed to demonstrate prejudice. The postconviction court, therefore, did not err in denying relief on this claim.

During the penalty phase, Dr. Maher diagnosed Smithers as suffering from a dissociative disorder not otherwise specified. Dr. Maher explained that while Smithers was "out of touch with reality in significant aspects of his beliefs and his ideas," he found insufficient information to diagnose psychosis. He stated, "I can't say he was not psychotic during some of these dissociative episodes but I'm not going to make the diagnosis simply out of uncertainty or in spite of some testing that shows he might be psychotic." Later, Dr. Maher again clarified, "I think he might have psychotic-I'm not saying he doesn't but it is not part of my diagnosis that there are psychotic episodes." He opined that both statutory mental health mitigating factors, extreme mental or emotional disturbance and substantially impaired capacity, were applicable to the murders and described each murder as "an impulsive action taken by a man who was in the midst of a dissociative episode." During cross-examination, Dr. Maher agreed that "dissociative disorder with possible psychotic features" would be an accurate description of the diagnosis.

At the postconviction evidentiary hearing, Dr. Maher testified that after reviewing the investigative report and learning that Snyder would testify that he never saw a man in a Bentley approach Smithers, Dr. Maher revised his diagnosis to "[p]sychotic episode recurrent." Dr. Maher testified that Smithers' insistence about the Bentley incident and Snyder"s lack of corroboration was "a pretty strong suggestion of psychosis or a drug-induced delirium or some other very substantial disturbance or perception and reality." He explained that at the time of trial, he was close to diagnosing Smithers with psychosis and that an "incident such as this which is clear and definite would in my judgment have led me to conclude that he was psychotic previously."

Dr. Maher revised diagnosis is largely cumulative to the opinion offered by Dr. Robert Berland, who testified as an expert in forensic psychology during the penalty phase. Dr. Berland diagnosed Smithers as having "a chronic mental illness, a chronic psychotic condition, at least in part a by-product of brain injury." Dr. Berland testified that Smithers' ex-wife told him about Smithers "doing things which are associated with auditory and tactical hallucinations." He opined that at the time of the murders, Smithers was "suffering from an extreme mental or emotional disturbance" as a result of "a chronic psychotic disturbance effecting [sic] his judgment and behavior" and that while Smithers' ability to appreciate the criminality of his conduct was not substantially impaired, his ability to conform his conduct to the requirements of law was substantially impaired. Dr. Berland further opined that at the time of the murders, Smithers "had an ongoing problem ... involving a series of delusions and hallucinations and mood disturbance and a panoramic distortion in his judgment and perceptions."

In light of the evidence presented at trial and the sentencing court's findings, we conclude that Dr. Maher's revised opinion does not undermine confidence in the death sentences. After considering the testimony of Dr. Maher, Dr. Berland, Dr. Wood (who testified about a PET scan and an MRI examination of Smithers), and the State's mental health experts, Dr. Donald Taylor and Dr. Barbara Stein, the sentencing court concluded that the mitigating factor of extreme mental or emotional disturbance was proven and was entitled to moderate weight. The sentencing court also concluded that the mitigating factor of substantially impaired capacity was proven and entitled to moderate weight. Despite finding these mitigating factors, the sentencing court "agree[d] with the unanimous jury that in weighing the aggravating circumstances against the mitigating circumstances, the scale tilts unquestionably to a sentence of death."

There is no reasonable probability that the sentencing court would have given significantly more weight to the statutory mental health mitigating factors

had Dr. Maher diagnosed Smithers as suffering from psychotic episode recurrent, rather than dissociative disorder with possible psychotic features. While the sentencing court was not aware of the possible hallucination about the man in the Bentley, the sentencing court was aware of Smithers' mental illness and considered how that illness impacted his actions at the time of the murders. When considered in context, the change in Dr. Maher's diagnosis simply does not rise to the level of undiscovered mitigation previously found to require a new penalty phase. See, e.g., *Hildwin v. Dugger*, 654 So.2d 107, 110 (Fla. 1995) (holding defendant prejudiced where trial counsel presented only lay witnesses and failed to present evidence of defendant's psychiatric hospitalizations and suicide attempts); *Phillips v. State*, 608 So.2d 778, 782-83 (Fla. 1992) (holding defendant prejudiced where trial counsel admitted doing "virtually no preparation" for penalty phase and failed to present evidence of borderline mental retardation, schizoid personality, head injury, and lifelong deficits in adaptive functioning).

*Smithers*, 18 So. 3d at 468-69.

The state court resolution of this issue was reasonable. Smithers now cites *Strickland*; *Gregg v. Georgia*, 428 U.S. 153 (1976); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 545 U.S. 374 (2005), in asserting that habeas relief is warranted. He claims that he was denied his right to an individualized sentencing when counsel failed to adequately investigate the mental mitigation. However, his allegation of a failure to "investigate" is refuted on the facts, as counsel clearly possessed this memorandum and knew all of the relevant information. The case does not present a scenario where counsel failed to investigate beyond reviewing a few reports as in *Wiggins;* nor is it like *Rompilla*, where counsel failed to review the evidence which the State would offer on aggravating circumstances and ignored obvious signs that the defendant had a troubled childhood and suffered from mental illness. The jury heard about Smithers' mental state from two experts, and heard from other mitigation witnesses as well. On these facts, Smithers was not denied his right to an individualized sentencing determination.

As the state courts found, the fact that Dr. Maher has now altered his diagnosis does not establish ineffective assistance of counsel. Considering that defense counsel testified that he gave all of the information to Dr. Maher as compared to Dr. Maher's failure to recall receiving the information that he previously testified about during the penalty phase, Smithers has simply failed to prove his claim that the expert was not given adequate information. The bottom line is Smithers had two mental health experts who did extensive testing and preparation and to whom experienced defense counsel gave comprehensive information. The state courts properly found no deficient performance.

Further, even if counsel were deficient, petitioner must still establish prejudice, i.e. that there is a reasonable probability that the result of the proceeding would have been different. Smithers offers no basis to reject the Florida Supreme Court conclusion that no possible prejudice occurred in this case. As the court found, Maher's revised opinion was essentially cumulative to the testimony of Dr. Berland at the penalty phase, and the trial court specifically found both statutory mental mitigating factors to apply. This case does not present substantial, compelling mitigation that was unknown to the sentencers which could have affected the recommendation and imposition of the death penalty.

A review of the trial court's sentencing order refutes any contention that this minor change in diagnosis would have altered the outcome. As previously noted, in the sentencing order, the trial court found the following three aggravators for the Cowan murder: (1) previous violent felony (contemporaneous murder), (2) the murder was especially heinous, atrocious, or cruel (HAC), and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification

(CCP); and two aggravators for the Roach murder: (1) previous violent felony (contemporaneous murder) and (2) HAC. (Ex. A2/246-53; A19/2366-73)

These aggravators were balanced against the following which the trial court found in mitigation: (1) the murder was committed while Smithers was under the influence of extreme mental or emotional disturbance (moderate weight) and (2) Smithers' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (moderate weight). The trial court also found the following nonstatutory mitigators: (1) Smithers was a good husband and father, (2) Smithers enjoyed a close relationship with his siblings, (3) Smithers was physically and emotionally abused by his mother as a child, (4) Smithers regularly attended church and was devoted religiously, (5) since being arrested, Smithers has been a model inmate and he would conduct himself appropriately in a prison setting, (6) Smithers has made several contributions to the community, and (7) Smithers confessed to the crimes, but his trial testimony was in conflict with his statements to the detectives. All of the nonstatutory mitigators were given moderate weight. Finally, the court gave great weight to John Cowan's request that Smithers be given a life sentence. (Ex. A2/254-60; A19/2375-82)

On these facts, no basis for habeas relief has been demonstrated on Smithers' claim that his attorney should have provided additional information to Dr. Maher.

Smithers' second subclaim in this issue asserts that counsel should have consulted and presented an independent medical examiner. This issue is also without merit. The Florida Supreme Court denied the claim, stating:

### D. Failure to Call Independent Medical Examiner as Defense Expert

Smithers argues that his trial counsel was ineffective for not retaining an independent medical examiner to refute testimony and argument about whether victim Cowan was alive and conscious when she was placed in the pond. The postconviction court found that counsel was not ineffective. We agree.

At trial, Dr. Laura Hair, Associate Medical Examiner in District Six, testified that based on the foam cone found around Cowan's mouth, the body being recovered from water, and the possibility that someone heard the victim calling from the pond, drowning was a "possibility." Dr. Hair explained:

At the time of the autopsy I did not consider the possibility of drowning. I really believed her to have been dead from her injuries in the pond. I got information later on that she may well have been making noise and that foam cone is probably indicative of drowning.

When asked if the congestion found in Cowan's lungs was consistent with drowning, Dr. Hair answered: "It's possible. It's consistent with a lot of things actually." Ultimately, Dr. Hair opined that the cause of death was "the combined effects of the manual strangulation and chop wounds of the head." She did not testify about whether the chop wounds were inflicted before or after Cowan was strangled, and she did not testify about at what point during the attack Cowan likely lost consciousness.

On cross-examination, the following exchange occurred between defense counsel and Dr. Hair:

Q. So you are testifying that foaming could be indicative of drowning. That's simply a possibility?

A. Yes.

Q. You are not able to make any conclusion correct?

A. No.

Q. In fact I believe you testified that you did not even think about drowning until you were told that somebody had said they heard voices, correct?

A. That's correct, yes, sir.

Q. And in fact you did not list it as a cause of death in preparing the Certificate of Death?

A. That's correct.

On re-cross- examination, defense counsel questioned Dr. Hair about whether the foam cone could have been caused by air escaping the body after death.

Q. That [foam if caused by last breaths or trapped air] is not an indication of breathing, correct?

A. No.

Q. And the person could be for that matter be unconscious when this is occurring?

A. You can breathe when you are unconscious, yes.

Q. And the person could be dead and there could be you said air that was trapped in the lungs that was escaping, is that correct?

A. That's correct.

At the postconviction evidentiary hearing, Dr. Ronald Keith Wright, M.D., testified as an expert in forensic pathology on behalf of Smithers. Dr. Wright opined that Cowan's cause of death was manual strangulation and that it was "highly unlikely" that she died of drowning. He testified about the specific physiological factors that caused him to believe she did not drown in freshwater, including the relatively light weight of her lungs, the lack of hemorrhaging to the mastoid air sinuses, and the lack of right-heart fibrillation. [FN4]

[FN4] During the hearing, Dr. Maher also testified briefly about Cowan's cause of death. His testimony was cumulative to Dr. Hair's trial testimony.

Trial counsel Scott Lyon Robbins testified that the defense strategy had been to argue that Cowan died of blunt trauma, not strangulation, before she was in the water. Attorney Robbins explained that he made a strategic

decision that Dr. Hair's testimony supported the defense's arguments. Attorney Robbins stated:

> My decision at the time was that we had what we needed to make the arguments we were trying to make from Dr. Hair's testimony. At that time that was what we proceeded with, that she wasn't given [sic] a definitive strangulation over the blunt trauma. She really wasn't saying which it was. There wasn't any statement as to whether the witness was conscious at any point. And to show that there was, you know, there was a particular painful or drawn out or cruel death was something that she really didn't nail down very well. And so that was the point we were trying to make was that that wasn't proven.

Because Smithers did not demonstrate that this decision to rely on Dr. Hair's testimony was unreasonable, the postconviction court did not err in denying this claim. In *Belcher v. State*, 961 So.2d 239 (Fla. 2007), this Court rejected a similar argument that defense counsel should have presented its own expert gynecologist, rather than relying on cross-examination of the State's expert. In that case, trial counsel testified that the defense felt that the State expert could "give them what they wanted." *Id.* at 250. This Court affirmed the denial of relief, finding that counsel made a reasonable strategic decision. The Court explained that it is not necessary for defense counsel to retain a defense expert "where defense counsel cross-examined the State's experts to establish the facts necessary for the defense." *Id.* In this case, Dr. Hair's testimony was silent as to whether Cowan was conscious during the strangulation and agreed that the evidence did not exclude the possibility that she was unconscious when placed in the pond. Thus, Dr. Hair's testimony was consistent with the defense's argument that Cowan lost consciousness quickly due to blows to the head. Accordingly, trial counsel was not deficient.

Moreover, Smithers failed to prove deficiency because much of Dr. Wright's testimony would have been harmful to the defense. Dr. Wright's testimony contradicted the argument that Cowan lost consciousness quickly due to blows to the head. He testified that based on the lack of internal bleeding, Cowan's head injuries were inflicted postmortem or perimortem after she was strangled to unconsciousness. See *Rose v. State*, 985 So.2d 500, 505-06 (Fla. 2008) (finding counsel made reasonable tactical decision not to call expert to discuss photographs due to concern that evidence could have harmed defense); *Provenzano v. State*, 616 So.2d 428, 432 (Fla. 1993) (finding counsel not deficient for failing to introduce records that contradicted defense's theory).

We also conclude that Smithers did not establish that he was prejudiced by the alleged deficient performance. While it is true that the State argued to the jury that Cowan may have drowned, Smithers has not shown a reasonable probability that the sentence imposed would have been different had the defense presented an expert witness.

The evidence does not undermine confidence in the sentencing court's finding that the murder was especially heinous, atrocious, or cruel (HAC). In discussing HAC, the sentencing court stated that the evidence established that "the death of Cristy Cowan was caused by or involved blunt impact to her face and head, manual strangulation, and possible drowning." However, the focus of the sentencing court's analysis was that the "strangulation death of a conscious victim is in and of itself a crime which is heinous, atrocious, or cruel." The testimony presented at the postconviction hearing supported, rather than contradicted, the finding that Cowan was strangled to death while conscious.

The evidence also does not undermine confidence in the sentencing court's finding that the CCP aggravating factor was applicable. In analyzing CCP, the sentencing court relied on the evidence that Smithers deliberately sought out Cowan and took her to the secluded property after he had already killed Roach. On appeal, this Court likewise relied on the events leading up to Cowan"s murder in finding CCP applicable. The postconviction evidence did not refute the evidence that Smithers picked up Cowan, took her to the property, and locked the gate behind them, after having recently killed Denise Roach.

Because trial counsel made a reasonable strategic decision not to call a defense expert and the evidence presented at the evidentiary hearing does not undermine confidence in the sentences, the postconviction court did not err in denying relief.

*Smithers*, 18 So. 3d at 467-472.

Smithers now claims that he was prejudiced by his attorneys' failure to present an independent medical examiner because the jury was allowed to retire after hearing factually incorrect information about Cowan having been alive and drowning when she was placed in the pond. The record reflects that counsel effectively rebutted the State's suggestion of a drowning, which was based on equivocal testimony anyway, through the cross

examination of the State's medical expert. In fact, a comparison of the testimony of the latest expert with Dr. Hair's trial testimony shows that their conclusions were very similar. Dr. Hair testified that the victim's death was caused by or involved blunt impact to her face and head, manual strangulation, and possible drowning. Medical Examiner Hair opined that the face and skull injuries were consistent with blows from an axe and a garden hoe, but that the presence of the foam cone made it possible that the victim was alive when she was thrown in the pond. (Ex. A7/682, 700-22) Smithers' new expert, Dr. Ronald Keith Wright, testified that it was his opinion that Ms. Cowan died of asphyxiation as a result of manual strangulation, but conceded that it was possible that she died of drowning. (Ex. C7/1018)

Additionally, trial counsel testified that his decision at the time was that "we had what we needed to make the arguments we were trying to make from Dr. Hair's testimony. At that time that was what we proceeded with, that she wasn't given a definitive strangulation over the blunt trauma. She really wasn't saying which it was. . . . And so to show that there was, you know, there was a particular painful or drawn out or cruel death was something that she really didn't nail down very well. And so that was the point we were trying to make was that that wasn't proven." (Ex. C8/1208) As this was a reasonable strategic decision, under *Strickland*, it is virtually unchallengeable. *Strickland v. Washington*, 466 U.S. 668, 690 (U.S. 1984) (strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.)

Moreover, this information was simply not material to the case where the aggravating factors are compelled by the facts without regard to whether Cowan was actually drowned as part of her death. It is significant that the judicial findings in support of the HAC and CCP

aggravating factors did not cite to or rely on any evidence of drowning. As the HAC finding was based on the beating aspect of the crime, the failure to challenge the drowning aspect of the crime cannot be shown to have prejudiced Smithers.

The state courts' conclusion that Smithers failed to establish ineffective assistance of counsel in the penalty phase is objectively reasonable.

In his memorandum in support of the petition, Smithers alleges that counsel was ineffective at the penalty phase for failing to call witnesses to document psychotic incidents in Smithers' recent past, thereby allowing the State, in its closing argument, to argue that there was a lack of evidence concerning Smithers' being psychotic.  (See pp. 27-30 of Memorandum in Support of Petition, Doc. 12).   This allegation has no merit.

A review of the record demonstrates that Smithers' claim of ineffective assistance of penalty phase counsel for failing to call witnesses to document psychotic incidents in Smithers' recent past was addressed by the state courts.  *See Smithers v. State*, 18 So. 3d 460, 468 (Fla. 2009). "The postconviction court denied this claim, concluding that trial counsel's performance was adequate because he presented two expert witnesses about Smithers' possible psychosis and additional testimony to establish mitigating factors.  The state trial court explained that 'changed opinions' do not establish ineffective assistance of counsel.  After reviewing the postconviction record and the trial record, we conclude that Smithers has failed to demonstrate prejudice." *Id.* at 468.

The contention that Smithers was prejudiced because the State could argue the absence of further evidence of psychosis in closing argument, however, was not segregated out of the claim by either court upon finding that Smithers' was not prejudiced

by the failure to present this evidence. *Smithers*, 18 So. 3d. at 467-469.  The failure to do so does not alter the deference this Court is required to afford the state courts' opinion.

The United States Supreme Court recently clarified this issue in *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011), explaining "[t]here is no text in [§2254(d)] requiring a statement of reasons. The statute refers only to a 'decision,' which resulted from an 'adjudication.' "

So, even where a "state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements in a multi-part claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Richter*, at 784.  Accord, *Cullen v. Pinholster*, 31 S.Ct. 1388, 1402, 1403 (2011) (Section 2254(d) applies even where there has been a summary denial.)

The Florida Supreme Court denied the ineffective assistance of penalty phase counsel claim on the merits. Even if this particular aspect of ground eight was not specifically addressed, the state court's denial is entitled to AEDPA deference as it is not required to explain its reasons for denying a claim.

Citing to *Richter*, *supra*, *Cullen* explained the standard to apply in these circumstances, noting that a petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [State] Court's decision. *Id., at ----,* 131 S. Ct. at 784. '[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask

whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.' *Id.*, at ----, 131 S. Ct. at 786." *Cullen*, 131 S.Ct. at 1402, 1403.

Smithers, like Pinholster, cannot satisfy this high threshold. *Cullen,* at 1403. When Smithers' claims are considered in context it is clear that the state court's conclusion that no prejudice resulted from penalty phase counsel's actions is not contrary to or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

In *Childers v. Floyd*, --- F.3d ---, 2011 WL 2162083, at * 10-11 (11th Cir., June 2, 2011), the Eleventh Circuit stated that "unless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the merits when the petition's claim 'is the same claim rejected' by the state court."  The pertinent portion of the opinion reads:

> The concept of an "adjudication on the merits" is the corollary of the long-held requirement that a state prisoner first exhaust his claims in state court. See id. § 2254(b)(1)(A) (requiring exhaustion of state court remedies); *Cone v. Bell*, ―― U.S. ――, 129 S.Ct. 1769, 1780, 173 L.Ed.2d 701 (2009) (calling exhaustion of state remedies prior to seeking federal habeas relief a "longstanding requirement"). Federal-state comity underlies this policy; before asking the federal court to "correct" a state court's mistake, the petitioner must first give the state court an opportunity to rule on the merits of his claim. *Cone*, 129 S.Ct. at 1780 ("When a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights." (quoting *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991))).
>
> Implicit in this scheme lies the possibility that the state court—presented with the petitioner's federal constitutional claim—may not rule on the merits of the petitioner's claim. *E.g., Cone*, 129 S.Ct. at 1784. In those instances, AEDPA deference—that we may not grant habeas relief unless the state court's decision was "contrary to" or an "unreasonable application of" federal

- 71 -

law—does not apply and federal courts evaluate the petitioner's claims de novo. Id. (citing *Rompilla v. Beard*, 545 U.S. 374, 380, 390, 125 S.Ct. 2456, 2462, 2467, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003)).

Faced with this possibility, the breadth of what it means to render an "adjudication on the merits" is of paramount importance. Decisions from this circuit and the United States Supreme Court have interpreted "adjudication on the merits" broadly. We have previously noted that § 2254 refers only to "decisions" and not to "opinions." *See Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir.2002). As such, a summary adjudication—a state court decision denying a petitioner's claim without an accompanying statement of reasons—is an adjudication on the merits under AEDPA. *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 780, 784, 178 L.Ed.2d 624 (2011); *Wright*, 278 F.3d at 1255. And, where the state court does explain its reasoning, that decision receives AEDPA deference even if the state court fails to cite—or is not even aware of—relevant Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (per curiam).

Deference to the autonomy and dignity of the state courts underlies this broad definition of "adjudication on the merits." Deciding cases on the merits either with no explanation or using the language of state law is a common practice. State courts with busy dockets may choose to summarily deny claims they deem weak and instead focus on claims requiring greater thought. *See Harrington,* 131 S.Ct. at 784 ("The issuance of summary dispositions in many collateral attack cases can enable a state judiciary to concentrate its resources on the cases where opinions are most needed."). Similar constraints may lead courts to decide the merits of claims using state law, with which the state courts are likely more familiar. *Cf. Early*, 537 U.S. at 7, 123 S.Ct. at 364 (ruling that the state court decided the petitioner's claim on the merits even though it referenced only a California rule of criminal procedure). Requiring detailed opinions would intrude on these state prerogatives. See Wright, 278 F.3d at 1255 ("Telling state courts when and how to write opinions to accompany their decisions is no way to promote comity."). Furthermore, to do so would be anomalous under the guise of a statute meant to give greater deference to state court decisions. *See Renico v. Lett*, —— U.S. ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) ("AEDPA thus imposes a highly deferential standard for evaluating state-court rulings ... and demands that state-court decisions be given the benefit of the doubt." (citations and internal quotation marks omitted)); *Wright,* 278 F.3d at 1255 ("Requiring state courts to put forward rationales for their decisions so that federal courts can examine their

thinking smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era.").

With these anchors in place, an "adjudication on the merits" is best defined as any state court decision that does not rest solely on a state procedural bar. *See Jason Williams v. Allen*, 598 F.3d 778, 796 (11th Cir. 2010) (" 'A decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed.' ") (quoting *Blankenship v. Hall*, 542 F.3d 1253, 1271 n. 4 (11th Cir. 2008)); *Wright,* 278 F.3d at 1255–56 (same). In *Harrington*, the Supreme Court essentially defined the term as such. The Court wrote: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. " 131 S.Ct. at 784–85 (emphasis added) (citations omitted).FN16 Therefore, unless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the merits when the petitioner's claim "is the same claim rejected" by the state court. *Early*, 537 U.S. at 8, 123 S.Ct. at 364. The District Court of Appeal clearly did not apply a procedural bar, and we may therefore presume that the court rendered an "adjudication on the merits."

*Childers v. Floyd, supra.*

The only "additional" witnesses Smithers claims should have been presented were the Snyders who would say that Smithers' original version of the Mr. X story that included the presence of Mr Snyder did not happen. The record shows, however, that when Smithers testified at trial he did not mention Snyder's being present when Mr. X came to visit his house. (A10/1126-27)

The Snyders' affidavit included damaging information such as Smithers' bragging about "killing niggers," in Tennessee and that he was suspected of burglarizing the Snyder home. (C8/1219)

Since Smithers did not testify in accordance with Diane Fernandez's report, it is questionable whether the Snyders' testimony would have been admissible, as it was not related to any evidence before the Court.  *See Owen v. State*, 986 So. 2d 534, 546 (Fla. 2008) (explaining that trial counsel cannot be deemed ineffective for failing to introduce inadmissible evidence).

Even if the Snyders' statements were relevant and admissible to support what Smithers now declares is evidence of a psychotic event, but what trial counsel thought could be just a "bad lie," (C8/1216-18) it would be cumulative to the evidence already before the jury. *Compare Bobby v. Van Hook*, 130 S.C. 13, 19-20 (2009) (finding no prejudice where additional mitigation was cumulative to evidence the trial court had already heard).

Trial counsel presented three mental health professional and Smithers' wife, Sharon Cole, who also recounted instances in which Smithers' behavior was consistent with hallucinations and delusional paranoid beliefs (A14/T1747-48) and where he struggled to function and appear normal. (A14T1748-49) They also presented Smithers' own testimony where he admitted to some psychotic symptoms, including hallucinations and delusions. (A14/T1738-44)

The jury recommended a death sentence by a vote of 12-0, even after hearing considerable evidence of mental mitigation.  The trial court found that both statutory mental mitigators (extreme emotional or mental disturbance and substantially impaired capacity) existed. (A2/209; A18T2351; A19T2375-78)   Balanced against the mental mitigators,

however, were the very substantial aggravators of the contemporaneous murders, HAC and CCP as to the Cowan murder.[2]

The state trial court's failure to specifically address the closing argument aspect of the claims does not alter Smithers' burden of establishing that the denial of relief was contrary to or an unreasonable application of clearly established law. *Cullen*, 131 S.Ct. at 1402-1403. Smithers has failed to show that the state court's finding that he was not prejudiced by the actions of penalty phase counsel was contrary to or an unreasonable application of clearly established law.

Ground eight does not warrant habeas corpus relief.

### GROUND NINE: Validity of  Rules Regarding Juror Interviews

Smithers challenges the constitutionality of procedural rules adopted by the Florida Bar governing an attorney's ability to conduct post-verdict juror interviews. (Petition, pp. 22-24; Memorandum, pp. 32-33)

Smithers did not present the denial of this postconviction claim in his appeal to the Florida Supreme Court. *Smithers*, 18 So. 3d at 463, n.1. The failure to present this claim on appeal constitutes abandonment of the claim.  The claim is unexhausted and procedurally barred from consideration. *O'Sullivan*, 526 U.S. at 848.

When Smithers raised the claim in a state habeas petition, the Florida Supreme Court expressly found the issue to be procedurally barred. *Smithers*, 18 So. 3d at 472. The express finding of a state procedural bar provides an additional basis for summary

---

[2] Smithers confessed to law enforcement that he committed the murders. (A9/T1045-46, 1050-64).

dismissal of this claim, and precludes federal habeas consideration of this issue. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 78 (1977).

<u>Claim Has no Merit</u>

Smithers has not offered any basis for the granting of habeas relief. First of all, this issue does not attack the constitutionality of Smithers' detention, only a state procedural rule which he claims inhibits his ability to investigate potential postconviction claims. Because his custody is not directly challenged, his complaint is beyond the scope of habeas review. *Carroll v. Secretary, Department of Corrections*, 574 F.3d 1354, 1365 (11th Cir. 2009); *Quince v. Crosby*, 360 F.3d 1259, 1261 (11th Cir. 2004).

In addition, even as pled in the habeas petition, this claim does not present any federal constitutional issue. Smithers' memorandum does not cite any federal cases or identify any established federal law from the United States Supreme Court. Therefore, this claim is facially insufficient. *Washington v. Crosby*, 324 F.3d 1263, 1265-66 (11th Cir. 2003); *Pulley*, 465 U.S. at 41.

In its alternative ruling denying this claim on the merits, the Florida Supreme Court held:

Smithers argues that rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar is unconstitutional. This Court has rejected similar challenges and has held rule 4-3.5(d)(4) to be constitutional. See, e.g., *Power v. State*, 886 So.2d 952, 957 (Fla. 2004) (holding that rule 4-3.5(d)(4) does not conflict with defendant's constitutional rights to fair trial and effective assistance of counsel).

- 76 -

*Smithers*, 18 So. 3d at 472. Smithers has clearly failed to demonstrate that this ruling was contrary to, or an unreasonable application of, established federal law.  Ground nine does not warrant habeas corpus relief.

### GROUND TEN: Penalty Phase Jury Instructions

Smithers alleges that the jury instructions provided at the penalty phase of his trial were constitutionally deficient. (Petition, pp. 24-25; Memorandum, pp. 33-47)

Smithers did not exhaust this in state court, since Smithers did not present the denial of this postconviction claim in his appeal to the Florida Supreme Court. *Smithers*, 18 So. 3d at 463, n.1. The failure to present these issues on appeal compels a finding that the claims were abandoned and are now unexhausted and procedurally barred from consideration. *O'Sullivan*, 526 U.S. at 848.

In addition, when the claims were offered to the Florida Supreme Court in a state habeas petition, that Court expressly found the issue to be procedurally barred. *Smithers*, 18 So. 3d at 472. The express finding of a state procedural bar provides an additional basis for summary dismissal of this claim, and precludes federal habeas consideration of this issue. *Coleman*, 501 U.S. at 750; *Wainwright*, 433 U.S. at 78.

Even if considered on the merits, no basis for habeas relief has been offered. Smithers presents four subclaims for consideration in this issue, which were alternatively rejected by the Florida Supreme Court as follows:

### B. Jury Instructions

Smithers argues that his jury was given inadequate instructions and that trial counsel was ineffective for failing to litigate the sufficiency of the instructions. The challenged instructions are virtually identical to Florida

Standard Criminal Jury Instruction 7.11. This Court has repeatedly held that the standard instructions do not violate *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). *See, e.g., Evans v. State*, 975 So.2d 1035, 1053 (Fla. 2007). The Court also has held that Florida's standard penalty-phase instructions do not unconstitutionally shift the burden of proof to the defendant, *see Arango v. State*, 411 So.2d 172, 174 (Fla. 1982), and that the standard instructions defining HAC and CCP are not unconstitutionally vague. *See Donaldson v. State*, 722 So.2d 177, 186 n. 10 (Fla. 1998) (holding standard HAC instruction not unconstitutionally vague and overbroad); *Bowles v. State*, 804 So.2d 1173, 1177 (Fla. 2001) (holding standard CCP jury instruction not unconstitutionally vague). Because each of Smithers' substantive arguments about the jury instructions is without merit, trial counsel was not ineffective for not raising those arguments. *See Evans*, 975 So.2d at 1043 (holding counsel not ineffective for failing to make meritless argument).

*Smithers*, 18 So. 3d at 472-73.

In the first subclaim, Smithers asserts that the state court rejection of this case was inconsistent with *Caldwell v. Mississippi*, 472 U.S. 320 (1985), because the jury was repeatedly told that its verdict was only an advisory recommendation. However, as the Eleventh Circuit has consistently recognized, Florida law dictates that a jury's decision as to whether to impose the death sentence is, in fact, an advisory recommendation. *Johnston v. Singletary*, 162 F.3d 630 (11th Cir. 1998); *Provenzano v. Singletary*, 148 F.3d 1327, 1334 (11th Cir. 1998); *Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997). In order to establish constitutional error under *Caldwell*, a petitioner must show that the comments or instructions to the jury "improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 2010 (1994). The Florida Supreme Court has repeatedly recognized that the instructions given Smithers' jury properly describe the jury's role in Florida. *Archer v. State*, 673 So. 2d 17, 21 (Fla. 1996) (Florida standard jury instructions adequately describe role to jury); *Pope v. Wainwright*, 496 So. 2d 798, 805

(Fla. 1986); *see also* 921.141, *Fla. Stat*. Thus, Smithers' jury was properly instructed on its role and no *Caldwell* error occurred here.

Smithers' next subclaim argues that the jury instructions unconstitutionally shifted the burden of proof. According to Smithers, because a Florida jury is not advised that its determination that sufficient aggravating factors outweigh the mitigation must be proven beyond a reasonable doubt, the burden unconstitutionally shifts to a defendant to prove that he is not death-eligible in a given case, thereby violating *In re Winship*, 397 U.S. 358 (1970); *Mullaney v. Wilbur*, 421 U.S. 684 (1975); and *Sandstrom v. Montana*, 442 U.S. 510 (1979).

The Eleventh Circuit has specifically upheld Florida's standard penalty phase jury instructions, which were provided to Smithers' jury (Ex. A18/2329-35), against the same burden-shifting argument now presented in his petition. *Henderson v. Dugger*, 925 F.2d 1309, 1317-18 (11th Cir. 1991); *Bertolotti v. Dugger*, 883 F.2d 1503, 1524-25 (11th Cir. 1989). To the extent Smithers suggests that these decisions must be re-examined in light of subsequent case law, his claim is without merit.

The instruction at issue does not establish a mandatory presumption, and therefore Smithers' reliance on *Sandstrom* is misplaced. *See generally, Francis v. Franklin,* 471 U.S. 307, 313-14 (1985) (discussing burden-shifting instructions and case law). And in Florida, the only possible "element" to prove a defendant convicted of first degree murder is eligible for the death penalty is the application of a single aggravating factor; the conclusion that sufficient aggravating factors outweigh the mitigation is not an element of any offense, but simply a relevant sentencing determination. *State v. Steele*, 921 So. 2d 538, 543 (Fla.

2005) ("To obtain a death sentence, the State *must* prove beyond a reasonable doubt at least one aggravating circumstance, whereas to obtain a life sentence the defendant need not prove any mitigating circumstances at all"); *Ring v. Arizona*, 536 U.S. 584, 612 (2002) (Scalia, J., concurring and noting distinction between sentencing factors, which can properly be assessed by a judge, from elements of a death-eligible offense, which must be found by a jury). Because the determination in Florida that sufficient aggravating circumstances exist in a capital case is strictly a sentencing consideration, *Winship* and *Mullaney* do not require an instruction that this determination must be proven beyond a reasonable doubt.

Smithers' assertions that the HAC and CCP jury instructions were unconstitutionally vague have already been addressed. *See* Ground 5, infra, as to HAC and Ground 6, infra, as to CCP. Notably, Smithers' jury was fully instructed to apply a narrow definition to these aggravating factors, and his claim to the contrary is refuted by the record. (Ex. A18/2330-32, 2339) While Smithers now claims that the HAC jury instruction given to his jury was "essentially" the same instruction struck down in *Shell v. Mississippi*, 498 U.S. 1 (1990), the instruction given in this case included an additional clarifying sentence, telling the jurors that "[t]he kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional acts that show the crime was consciousless, pitiless, and unnecessarily torturous to the victim." (Ex. A18/2331, 2339) Because the instruction to Smithers' jury did not suffer the same defect as noted in the jury instruction cases he cites, the Florida Supreme Court did not rule contrary to established federal law or reject this claim unreasonably.

Smithers has failed to demonstrate that the state court ruling on this issue was contrary to, or an unreasonable application of, established federal law. Ground ten does not warrant habeas corpus relief.

### GROUND ELEVEN:

### Constitutionality of Florida's Capital Sentencing Scheme

Smithers asserts that Florida's death penalty is unconstitutional pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002). (Petition, pp. 25-26; Memorandum, pp. 47-48)

This claim was not exhausted in state court, since Smithers did not present the denial of this postconviction claim in his appeal to the Florida Supreme Court. The failure to present these issues on appeal compels a finding that the claims were abandoned and are now unexhausted and procedurally barred from consideration. *O'Sullivan*, 526 U.S. at 848. In addition, when the claims were offered to the Florida Supreme Court in a state habeas petition, that Court expressly found the issue to be procedurally barred. *Smithers*, 18 So. 3d at 472. The express finding of a state procedural bar provides an additional basis for summary dismissal of this claim, and precludes federal habeas consideration of this issue. *Coleman*, 501 U.S. at 750; *Wainwright*, 433 U.S. at 78.

Although Smithers attempted to assert a challenge to the constitutionality of Florida's death sentencing procedure in his direct appeal, the Florida Supreme Court never considered the merits of that challenge. The record reflects that Smithers requested leave to file a supplemental brief following the granting of certiorari review of *Ring v. Arizona* in the United States Supreme Court. (Ex. A37/3) This was prior to the *Ring* decision itself and Smithers' request was denied; no supplemental brief was accepted or considered by the

- 81 -

Florida Supreme Court. Because the Florida Supreme Court has never considered the merits of this claim in this case, *Cone v. Bell*, 129 S. Ct. 1769 (2009), does not preclude the application of procedural default to prohibit federal review.

<u>Claim Has no Merit</u>

Smithers asserts that Florida's sentencing scheme is unconstitutional under *Ring v. Arizona,* 536 U.S. 584 (2002). In *Ring*, the United States Supreme Court found that the death penalty scheme in Arizona violated the defendant's Sixth Amendment right to counsel, because the judge could sentence a defendant to death without a jury making the necessary finding of death eligibility. As Florida is not a judge-sentencing state like Arizona, the rejection of this claim was not contrary to, or an unreasonable application of, *Ring*.

In addition, the Florida Supreme Court ruled alternatively that Smithers was not entitled to any relief under *Ring*:

### C. Capital Sentencing Scheme

Smithers argues that pursuant to *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Florida's capital sentencing scheme is unconstitutional as applied to him and that trial counsel was ineffective for not litigating this issue. A defendant is not entitled to relief on the basis of *Ring* where, as in this case, the prior violent felony conviction aggravating factor is present, and "counsel cannot be deemed ineffective for failing to make a meritless argument." *Evans*, 975 So.2d at 1043, 1052-53. To the extent that Smithers may assert that appellate counsel was ineffective for failing to litigate this issue, his argument is without merit. Appellate counsel cannot be deemed ineffective for failing to raise a meritless argument. *See Rutherford*, 774 So.2d at 643.

*Smithers*, 18 So. 3d at 473.

Application of the death penalty in this case did not violate Smithers' right to a jury trial, as his jury specifically recommended the death penalty. (Ex. A2/209; A18/2351) In

addition, the fact that Smithers' death eligibility is established by a prior violent felony conviction precludes a finding of constitutional error under *Ring. Almendarez-Torres v. United States*, 523 U.S. 224 (1998) (prior conviction properly used by judge alone to enhance defendant's statutorily authorized punishment). Thus, the state courts' rejection of this claim was not only objectively reasonable, but correct. For all of these reasons, *Ring* is of no benefit to Smithers.  Ground eleven does not warrant habeas corpus relief.

### GROUND TWELVE: Cumulative Error

Smithers asserts that he was denied his right to a fair trial due to the combination of a number of procedural and substantive trial errors. (Petition, pp. 27-28; Memorandum, pp. 48-49)

This claim does not provide a cognizable basis for relief in habeas actions. Although Smithers does not identify any specific errors he believes must be considered in this claim, many of the issues he presents in his habeas petition are not properly before the Court, and therefore not subject to consideration in a cumulative error analysis. *Sims v. Singletary*, 155 F.3d 1297, 1314 (11th Cir. 1998) (reversing grant of habeas relief on sentencing due to cumulative guilt phase errors; noting claims barred procedurally or on non-retroactivity grounds could not be considered in cumulative analysis), *cert. denied*, 527 U.S. 1025 (1999).

Smithers cites to *Taylor v. Kentucky*, 436 U.S. 478 (1978), for support in this claim. In *Taylor*, the United States Supreme Court found that due process required, on the facts of that case, that the jury be fully instructed on a defendant's presumption of innocence, and that the failure to provide the instruction requested by the defense amounted to

constitutional error. In Smithers' case, his jury was fully and adequately instructed on his presumption of innocence, and Smithers has never contended otherwise. (Ex. A11/1323-24) *Taylor* offers no support for Smithers' current claim of cumulative error, and suggests no impropriety in the state courts' rejection of this issue.

Smithers has failed to demonstrate any basis for habeas relief. The Florida Supreme Court denied this claim as follow:

### D. Cumulative Error

Smithers argues that the cumulative effect of the substantive and procedural errors denied him a fair trial. This Court found no reversible error on direct appeal, and Smithers has not demonstrated through his postconviction motion and appeal or this petition that any additional error occurred that was not considered on direct appeal. Thus, he is not entitled to relief on the basis of cumulative error. *See, e.g., Owen*, 986 So.2d at 556-57 (denying cumulative error claim where defendant did not show that any harmful error occurred).

*Smithers*, 18 So. 3d at 473. This ruling is not contrary to, or an unreasonable application of, any established federal law. Smithers offers no specific complaint about the state courts' resolution of this issue. He has not specifically identified any trial errors requiring cumulative consideration, or otherwise demonstrated a violation of any constitutional right.

Ground twelve does not warrant habeas corpus relief.

### GROUND THIRTEEN: Competency To Be Executed

Smithers asserts only a potential future issue, speculating that he might be incompetent to be executed. (Petition, pp. 28-30; Memorandum, pp. 49-50)

Smithers has not exhausted this issue, since it is not subject to consideration on the merits in the state court until a death warrant has been signed and execution is imminent.

*See* Section 922.07*,* Florida Statutes; Florida Rule of Criminal Procedure 3.811. Therefore, this issue must be summarily denied as unexhausted and premature.  Even if the claim is considered, Smithers has failed to offer any basis for habeas relief. The United States Supreme Court has acknowledged that this claim, unripe in an initial habeas petition, is appropriately dismissed. *Panetti v. Quarterman*, 551 U.S. 930, 943 (2007) (observing that, while conscientious attorneys may present this claim in an initial petition, doing so is not necessary and counterintuitive to effective practice). Under established federal law, dismissal of this claim as premature at this point will not preclude later federal review, once the claim has been exhausted and is properly before this Court for consideration. *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998).

The Florida Supreme Court rejected this claim as follows:

### E. Competency at Time of Execution

Finally, while acknowledging that a claim of incompetency at the time of execution is not ripe until a death warrant is issued, Smithers nevertheless argues that he may be incompetent at the time of his execution. We agree that this claim is premature. The claim is hereby denied without prejudice to raise the issue once a death warrant is signed. *See Preston v. State*, 970 So.2d 789, 805 (Fla.2007).

*Smithers*, 18 So. 3d at 473. This ruling was not contrary to, or an unreasonable application of, established federal law. Smithers cites *Ford v. Wainwright*, 477 U.S. 399 (1986), but the state court finding this claim to be premature is not inconsistent with *Ford*. Because Florida has procedures in place to ensure judicial review of any competency claim that may be available at the time of execution, *Ford* is satisfied. As no basis for habeas relief has been offered in this issue, ground thirteen does not warrant habeas corpus relief.

Accordingly, the Court orders:

That Smithers' petition is denied.  The Clerk is directed to enter judgment against Smithers and to close this case.

## CERTIFICATE OF APPEALABILITY AND

## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

The Court declines to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts because Petitioner has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).

Because Petitioner is not entitled to a certificate of appealability, Petitioner is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on June 15, 2011.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record